**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RAFAELA ALDACO, ) | |
| ) | |
| ) | |
| Plaintiff, ) | Case No. 1:16-cv-05754 |
| ) | |
| v. ) | The Honorable Joan H. Lefkow |
| ) | |
| RENTGROW, INC. d/b/a Yardi Resident ) | |
| Screening, ) | **REDACTED** |
| ) | **PURSUANT TO LOCAL RULE 26.2** |
| Defendants. ) | |
| ) | |
| ) | |

**DEFENDANT'S LOCAL RULE 56.1
STATEMENT OF UNDISPUTED MATERIAL FACTS**

**I.     The Parties, Jurisdiction, and Venue.**

1.     Defendant RentGrow, Inc. d/b/a Yardi Resident Screening ("YRS") is a wholly-owned subsidiary of Yardi Systems, Inc.  YRS provides background reports regarding potential tenants to landlords and apartment management companies.  (Ex. 1, 3/8/2017 Hennessey Dep. at 53:7-8; Ex. 25, Answer to Compl. ¶ 4.)  YRS's corporate headquarters are located in Waltham, Massachusetts. (Ex. 25, Answer to Compl. ¶ 3.)  YRS conducts business in the Northern District of Illinois. (*Id.*)

2.     Plaintiff Rafaela Aldaco is an adult resident of Hanover Park, Illinois, which is situated in the Northern District of Illinois.  (*See* Ex. 31, Compl. ¶ 2; Ex. 32, Ptf. Resp. to Interrogs. ¶ 1.)

3.     On June 1, 2016, Plaintiff filed this suit against YRS based upon alleged violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.* (*See* Ex. 31, Compl. ¶ 1.)  Specifically, Plaintiff claims that YRS negligently or willfully failed to maintain and follow "reasonable procedures" in violation of 15 U.S.C. § 1681e(b). (*See* Ex. 31, Compl. ¶¶ 37-38.)  Plaintiff also claims that YRS negligently or willfully failed to conduct a reasonable

reinvestigation of Plaintiff's dispute in violation of 15 U.S.C. § 1681i. (*See* Ex. 31, Compl. ¶ 39.) This Court therefore has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1681p and 28 U.S.C. § 1331. (*See* Ex. 25, Answer to Compl. ¶ 6.)

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2). (*See* Ex. 25, Answer to Compl. ¶ 7.)

**II.**   **YRS's Tenant Screening Business.**

5. YRS, a reseller consumer reporting agency, produces consumer reports pertaining to the histories of potential tenants for landlords and apartment management companies. (Ex. 1, 3/8/2017 Hennessey Dep. at 13:20-23; Ex. 25, Answer to Compl. ¶ 4.) YRS has been in business since 1989. (Ex. 1, 3/8/2017 Hennessey Dep. at 16:7-8.)

6. YRS provides these Resident Screening services through its proprietary web portals, including its Yardi Voyager® software, through which a tenant screening report, or Applicant File—i.e., a document that contains data regarding a potential tenant on a property—is generated. (Ex. 30, YRS Process Overview at RG000067-68.) The tenant screening report contains data from different types of searches requested by YRS's clients, such as credit history and criminal background history. The data comes from various data providers with whom YRS does business. The types of data that may be included are credit data, criminal history data, civil court data, rental history data, and data from the Office of Foreign Asset Control. (Ex. 1, 3/8/2017 Hennessey Dep. at 21:17 – 22:13.)

7. YRS does not make leasing decisions. The decision to rent an apartment is solely that of the property's landlord. YRS simply provides data that its clients use to make leasing decisions. (Ex. 1, 3/8/2017 Hennessey Dep. at 27:10-13.)

8. Specifically, YRS clients (i.e. rental properties) provide decision criteria to YRS specifying tenant background information such as credit history and criminal history. (Ex. 30, YRS Process Overview at RG000065; Ex. 17, BH Management Resident Screening Criteria at RG00239.) Those criteria then are imported into the YRS software system for that specific property. (*Id*.) When an end-user, (i.e. property manager, leasing agent, or other housing

specialist) then requests a background screening check for a potential tenant, the results from the background check are filtered through the property's criteria set. (*Id*.) For the Premium services, ███████████████████████████, the YRS Public Records Analyst then marks the result either "Meets Property Requirements" or "Does Not Meet Property Requirements." (*Id*; Ex. 14, 1/12/16 J. Yellin E-mail and Attachments at RG 000055.)

**III.     YRS Maintains Reasonable Policies and Procedures to Ensure the Accuracy of the Information it Reports.**

9.     YRS maintains reasonable policies and procedures to ensure the maximum possible accuracy of reportable civil and criminal public records information pursuant to the requirements of the Fair Credit Reporting Act. (Ex. 1, 3/8/2017 Hennessey Dep. at 53:13-24; 156:20 – 157:3.)

10.     In YRS's business there is nothing more important than ensuring the accuracy and integrity of the data they are selling. YRS ensures the accuracy and the completeness of its tenant screening reports through the automatic and manual filtering processes and procedures that it has in place. (Ex. 1, 3/8/2017 Hennessey Dep. at 206:19-207:9.)

11.     YRS keeps statistics on a month-to-month basis regarding its criminal history reports. (Ex. 1, Hennessey Dep. at 60:21-62:8; Ex. 26, Def. Resp. to Interrogs. Addendums A and B.)

12.     In January of 2016—the month in which YRS prepared Plaintiff's criminal history report—YRS performed a total of ████ criminal screenings. These ████ criminal screenings resulted in ████ total screenings with criminal records. After applying its manual filtering process, YRS ultimately reported a criminal record on ████ reports. Consumer disputes were initiated on ██ of these ████ screenings. ██ of these disputes were successful. Thus only ██ of the ████—or ████—of the reports containing criminal records resulted in a successful dispute. Overall, for January of 2016, ████ of the total criminal screenings with reported criminal records were accurately reported. (Ex. 26, Def. Resp. to Interrogs. Addenda A, B.)

3

13. The statistics from January of 2016 are consistent with data from March of 2015 through January of 2017. In that time frame, YRS's percentages of total criminal screenings with accurately reported criminal records ranged from ▮▮▮▮ (in October 2015) through ▮▮▮▮ (in January 2017). (Ex. 26, Def. Resp. to Interrogs. Addendum B.)

14. The YRS tenant screening process begins when a rental property requests a report through the web portal, providing the applicant's name, social security number (if available), date of birth, and address. (Ex. 1, 3/8/2017 Hennessey Dep. at 41:6-11.)

15. If the search is for criminal history only, a social security number is not necessary, as criminal records do not include social security numbers. (Ex. 6, YRS Criminal Screening Filtering Process at RG000063; Ex. 1, 3/8/2017 Hennessey Dep. at 80:10 – 81:13.)

16. YRS is a reseller of data it obtains from third-party data furnishers. (Ex. 2, 3/9/2017 Hennessey Dep. at 41:1-2.) It maintains no databases of background information. Instead, it requests information from other consumer reporting agencies that do maintain databases, and then provides reports to its clients through its integrated software and web portals, filtered through the clients' tenant criteria. (*See* Ex. 30, YRS Process Overview.)

17. Specifically for criminal background searches, YRS applies a two-step filtering process on the records it receives from the data furnishers to ensure the maximum possible accuracy of its criminal history reports. (*See* Ex. 6, YRS Criminal Screening Filtering Process at RG000063-64.)

18. First, YRS filters the data received from the data furnisher with its proprietary algorithms in order to eliminate false positives and confirm the accuracy of data. Then, a YRS team of public records analysts manually review each remaining record or "hit" in order to ensure the accuracy and timeliness of the records, and to apply the criteria set forth by each client. (Ex. 1, 3/8/2017 Hennessey Dep. at 54:9-16.)

19. The first step, which is automatic, uses algorithms t▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
██████████████████████████████████████████████ (*See* Ex. 6, YRS Criminal Screening Filtering Process at RG000063; *see also* Ex. 1, 3/8/2017 Hennessey Dep. at 79:1-19.)

20. The first step of the YRS criminal screening filtering process automatically eliminates certain of these records, including r█████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████ (Ex. 1, 3/8/2017 Hennessey Dep. at 55:5-18.)

21. Because it is possible that non-reportable criminal records may make it through the automatic filtering system, YRS applies a second-level manual review by a public records analyst. (Ex. 6, YRS Criminal Screening Filtering Process at RG000064; Ex. 1, 3/8/2017 Hennessey Dep. at 82:17-21.) This public records analyst confirms that any remaining criminal record actually belongs to a consumer, based on the consumer information provided and that a record is not too old to be reportable. (Ex. 2, 3/9/2017 Hennessey Dep. at 21:10-19.) As part of the manual filtering step, public records analysts employ "charge exclusion rules" to determine whether a criminal charge is reportable under the Fair Credit Reporting Act. (*See* Ex. 8, Charge Exclusion Rules; Ex. 1, 3/8/2017 Hennessey Dep. at 129:2-7.) A public records analyst has to look at multiple identifiers, including the applicant's name, date of birth, and address to determine whether or not there is a match between a criminal record and an applicant. (Ex. 1, 3/8/2017 Hennessey Dep. at 81:19 – 82:5.)

22. YRS primarily relied on E-Backgroundchecks.com ("BGC") for criminal background searches █████████████████████████████████████████ ██████████████████████████████ (Ex. 1, 3/8/2017 Hennessey Dep. at 45:21 – 47:12.) YRS's agreement with BGC confirms that YRS is a "consumer reporting agency" as defined in the

5

FCRA. Backgroundchecks.com is a d/b/a of e-backgroundchecks.com, Inc., which is a CRA that provides consumers' criminal background information to purchasers, including other CRAs such as YRS. (Ex. 28, BGC Agreement at RG000080.)

23. At the time YRS obtained Plaintiff's criminal background information from BGC, BGC was subject to, and by every indication in compliance with, a consent order issued by the Consumer Financial Protection Bureau ("CFPB") requiring it to use specified, robust procedures to ensure maximum possible accuracy with respect to its criminal background reporting. (*See* Ex. 22, Request for Judicial Notice; Ex. 23, 10/29/15 Consent Order filed in Admin. Case No. 2015-CFOB-0028, available at http://files.consumerfinance.gov/f/201510_cfpb_consent_-order_general-information-service-inc.pdf; Ex. 24, 10/29/15 Stipulation and Consent to the Issuance of a Consent Order filed in Admin. Case No. 2015-CFPB-0028, available at http://files.consumerfinanace.gov/f/201510_cfpb_stipulation_general-information-sevice-inc.pdf.)

24. Cook County courts do not provide online criminal docket information. (Ex. 2, 3/9/2017 Hennessey Dep. at 44:4-8.)

25. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Ex. 8, Charge Exclusion Rules at RG000136; Ex. 1, 3/8/2017 Hennessey Dep. at 136:3-9.)

26. Plaintiff concedes that criminal convictions may be reported indefinitely under the FCRA. (Ex. 31, Compl. ¶ 35.)

27. YRS public records analysts are trained on how to do their job by the department managers and by senior members of the public records team. The training typically takes several months. Before an employee can start working as a public records analyst, the employee has to go through a certain number of training sessions and pass several tests. (Ex. 1, 3/8/2017 Hennessey Dep. at 75:14 – 76:12; Ex. 33, FCRA Compliance Training Module.) YRS employees in the screening business also are required to attend training with respect to the Fair Credit Reporting Act at least once annually. (Ex. 1, 3/8/2017 Hennessey Dep. at 17:20 – 18:1.)

28. YRS also maintains a "Public Records Analyst Training Guide," which is a step-by-step procedure book that discusses policies with respect to what is reportable and not reportable under the Fair Credit Reporting Act. Every public records analyst has the guide available to them, and must review the guide before starting their position as a public records analyst. (Ex. 1, 3/8/2017 Hennessey Dep. at 110:15 – 111:12; Ex. 27, Public Records Analyst Training Guide.)

29. All of the YRS policies and procedures are sources of information that are available to YRS personnel in the tenant screening business. (Ex. 1, 3/9/2017 Hennessey Dep. at 48:2-7.)

30. The YRS public records analysts are trained to spot dispositions that are convictions, and dispositions that are not convictions. This training occurs through a "disposition list," which is a list of terms that can appear in the disposition field of a criminal records report. The dispositions are identified as either being equivalent to being convicted or equivalent to being acquitted. (Ex. 34, Disposition List; Ex. 1, 3/8/2017 Hennessey Dep. at 119:9 – 120:5.)

31. T (Ex. 34, Disposition List; Ex. 1, 3/8/2017 Hennessey Dep. at 91:1-16.)

32. YRS's public records team uses the disposition list when they come across a word, term, or statement in the disposition field of a criminal conviction charge that they are not familiar with. The public reference team would reference the disposition list to identify what the disposition is, and what action should be taken. (Ex. 2, 3/9/2017 Hennessey Dep. at 11:10-17.)

33. In preparing Plaintiff's tenant screening report, YRS followed its procedures to ensure maximum possible accuracy. YRS did not deviate from those procedures in preparing Plaintiff's report. (Ex. 2, 3/9/2017 Hennessey Dep. at 9:23 – 10:11.) Plaintiff's criminal history

was obtained from BGC. (Ex. 1, 3/8/2017 Hennessey Dep. at 47:5-8; Ex. 11, BGC Report.) It was then run through the automatic filtering process, and manually reviewed by a YRS public records analyst. (Ex. 1, 3/8/2017 Hennessey Dep. at 157:20 – 159:3; Ex. 35, Screenshot of Add Serve System.)

### IV. Plaintiff's Criminal History Report.

34. Plaintiff Rafaela Aldaco applied with a private, faith-based organization called Fellowship Housing Corporation ("FHC") to obtain subsidized housing through a two-year program for single mothers at risk of homelessness. (Ex. 7, FHC Application; Ex. 31, Compl. ¶ 12.)

35. FHC maintains a number of potential housing options, including apartments at The Reserve at Hoffman Estates ("The Reserve"). (Ex. 4, H. Corins Dep. at 45:5-18.) The Reserve is located at 875 Pacific Ave., Hoffman Estates, IL 60169. (Ex. 32, Ptf. Resp. to Interrogs. ¶ 4.) The Reserve is also known as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 29, BH Management Services Agreement.)

36. Plaintiff was approved through the FHC process and then visited The Reserve at Hoffman Estates with a FHC representative on January 12, 2016 in order to complete The Reserve's application process. (Ex. 31, Compl. ¶¶ 15-16.)

37. The Reserve's Resident Screening Criteria dictates that they do not accept tenants who have been convicted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 17, BH Management Resident Screening Criteria at RG00239.)

38. At the time of Plaintiff's visit, The Reserve requested a criminal-only background check on Plaintiff through the YRS portal. (Ex. 1, 3/8/17 Hennessey Dep. at 124:14-20; Ex. 5, Tenant Screening Report.) That background check, from BGC, resulted in a report that Plaintiff did not meet The Reserve's tenant requirements, so Plaintiff's application with The Reserve was not accepted. (Ex. 5, Tenant Screening Report.) Plaintiff then left and did not further contact The Reserve. (Ex. 3, Aldaco Dep. at 151:18-156:2.)

8

39. Pursuant to the requirements of the FCRA, Plaintiff was given information so that she could contact YRS to find out why she did not qualify for The Reserve. (Ex. 14, 1/12/16 J. Yellin E-mail and Attachments at RG 000049-62.) That same day, January 12, 2016, YRS provided her a copy of the criminal report based on information it received from E-Backgroundchecks.com. (*Id.* at RG000050-54.) That report revealed a 1996 conviction for ▊▊▊▊ in Cook County, to which Plaintiff was sentenced to court supervision and community service. (*Id.* at RG000055-57.) YRS reported the record exactly as YRS received it from E-Backgroundchecks.com, the data furnisher. (*Compare id.* at RG000055-57 *with* Ex. 11, BGC Report at RG000009-13.)

40. YRS also sent to Plaintiff, that same day, instructions and the dispute form should Plaintiff want to dispute the record. (Ex. 14, J. Yellin E-mail and Attachments at RG000049-62.) That dispute form requested multiple types of information and specifically requested that Plaintiff provide any supporting documentation to her dispute. (*Id.* at RG000058.)

**V.    Dispute and Reinvestigation.**

41. Plaintiff indeed submitted the dispute form that day, which disputed only that the record at issue did not belong to her, but instead to a former boyfriend. (Ex. 18, R. Aldaco Dispute Form; Ex. 3, Aldaco Dep. at 163:8 – 164:14.) Plaintiff provided no other information indicating any other purported inaccuracy nor any supporting documentation. (Ex. 18, R. Aldaco Dispute Form; Ex. 9, 1/12/16 R. Aldaco E-mail and Attachments; Ex. 3, Aldaco Dep. at 172:12 – 174:18.) Importantly, at no point did Plaintiff state that the record was incomplete or inaccurate because she had completed her sentence of community service and court supervision and/or that the conviction was dismissed. (*Id.*) Instead, Plaintiff still maintains that the record does not belong to her—which is belied by the Certified Statement of Conviction/Disposition. (Ex. 3, Aldaco Dep. at 186:10 – 190:8; Ex. 19, Court Disposition.)

42. YRS forwarded the dispute request to E-Backgroundchecks.com, the data furnisher, for investigation pursuant to the FCRA procedure. (Ex. 12, 1/13/16 Email at RG000039-41.)

9

43. YRS also undertook its own investigatory steps as a courtesy. (Ex. 1, 3/8/2017 Hennessey Dep. at 169:21 – 170:4.) A YRS team member contacted the Cook County Clerk's office to confirm the identity of the record, but the team member received no response. (Ex. 15, Dispute Investigation Note; Ex. 1, 3/8/2017 Hennessey Dep. at 162:22-163:2.)

44. A few days later, YRS received notice from E-Backgroundchecks.com that based on its investigation, the record at issue did belong to Plaintiff and therefore, that no change to the record was warranted. (Ex. 10, 1/15/16 Email at RG000008.) YRS reported that result to both Plaintiff and to its customer, The Reserve. (Ex. 13, 1/18/16 Email from J. Yellin to R. Aldaco at RG000042-47; Ex. 16, 1/18/16 Email from J. Yellin to BH Management at RG000048.)

45. YRS also informed Plaintiff at that time that she could contact either E-Backgroundchecks.com, the consumer reporting agency that provided YRS with the disputed information, or she could re-contact YRS. (Ex. 13, 1/18/16 Email from J. Yellin to R. Aldaco at RG 42.)

46. During this timeframe, Plaintiff consulted with FHC and an attorney, and then Plaintiff herself went to the Cook County Clerk's office and obtained a paper record Certified Statement of Conviction/Disposition of her 1996 ▮▮▮▮ conviction, Case No. ▮▮▮▮▮6301, on or about January 21, 2016. (Ex. 19, Court Disposition; Ex. 3, Aldaco Dep. at 166:12 – 172:6.) The record indicated that Plaintiff was found guilty of ▮▮▮▮ and was sentenced to community service and court supervision. (Ex. 19, Court Disposition.)

47. That paper record contains identical information as that reported by E-Backgroundchecks.com to YRS (and later relied upon by YRS in completing Plaintiff's background check), except that the paper record also includes a date of June 17, 1997 as discharge of the supervision term. (*Compare* Ex. 11, BGC Report at RG000009-13 *with* Ex. 19, Court Disposition.)

48. Neither Plaintiff nor her attorney provided the paper record to YRS or E-Backgroundchecks.com, nor did Plaintiff (or her attorney) contact either YRS or E-Backgroundchecks.com with any further information. (Ex. 3, Aldaco Dep. at 172:7 – 174:18.)

10

49. Instead, Plaintiff's attorney, through FHC, advised Plaintiff to "keep a log of expenses," and Plaintiff worked with her attorney to have the 1996 ▓▓▓▓ conviction expunged, which was completed on May 1, 2016. (Ex. 21, 1/22/16 H. Corins Email at FHC000105; Ex. 20, Expungement Order.) Plaintiff also discontinued her application for participation in the FHC program during this time. (Ex. 3, Aldaco Dep. at 184:16 – 186:9.)

Dated: May 25, 2017

Respectfully submitted,

By: */s/ Patrick Duffey*

**Deanna R. Kunze**
dkunze@nixonpeabody.com
**Patrick Duffey**
pduffey@nixonpeabody.com
**Laura B. Bacon**
lbbacon@nixonpeabody.com
**NIXON PEABODY LLP**
70 West Madison, Suite 3500
Chicago, IL 60602
Tel:   312-977-4443
Fax:   844-560-8137

*Attorneys for Defendant RentGrow, Inc. d/b/a Yardi Resident Screening*

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing **Defendant's Local Rule 56.1 Statement of Undisputed Material Facts** was filed electronically on this 25th day of May, 2017, in compliance with the General Order on Electronic Case Filing, Section III(B)(1). As such, this document was served on all counsel who are deemed to have consented to electronic service. Fed. R. Civ. P. 5(b)(2)(E) and Local Rule 5.9.

*/s/ Patrick Duffey*