# EXHIBIT

## 22

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RAFAELA ALDACO, | ) |
| | ) |
| | ) |
| Plaintiff, | )   Case No. 1:16-cv-05754 |
| | ) |
| v. | )   The Honorable Joan H. Lefkow |
| | ) |
| RENTGROW, INC. d/b/a YARDI | ) |
| RESIDENT SCREENING, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DEFENDANT'S REQUEST FOR JUDICIAL NOTICE

      Pursuant to Rule 201 of the Federal Rules of Evidence, Defendant RentGrow, Inc. d/b/a Yardi Resident Screening, by and through its counsel, respectfully requests that this Court take judicial notice of the facts within the following documents attached as Exhibits to the Local Rule 56.1 Statement of Undisputed Material Facts ("SUF") and supported by the Declaration of Deanna Kunze:

    1.      The Certified Statement of Conviction / Disposition (SUF ¶¶ 41, 46; Ex. 19).

    2.      Stipulation and Consent to the Issuance of a Consent Order filed in Admin Case No. 2015-CFPB-0028 (SUF ¶ 23, Ex. 24).

Judicial notice of the facts contained within these documents is appropriate because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2) (2017).

1

Dated:  May 25, 2017

Respectfully submitted,

By:  /s/ Patrick Duffey

**Deanna R. Kunze**
dkunze@nixonpeabody.com
**Patrick Duffey**
pduffey@nixonpeabody.com
**Laura B. Bacon**
lbbacon@nixonpeabody.com
**NIXON PEABODY LLP**
70 West Madison, Suite 3500
Chicago, IL 60602
Tel:    312-977-4400
Fax:    844-560-8137

*Attorneys for Defendant RentGrow, Inc. d/b/a Yardi Resident Screening*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a copy of this DEFENDANT'S REQUEST FOR JUDICIAL NOTICE was filed electronically on this 25th day of May, 2017, in compliance with the General Order on Electronic Case Filing, Section III(B)1). As such, this document was served on all counsel who are deemed to have consented to electronic services. Fed. R. Civ. P. 5(b)(2)(E) and Local Rule 5.9.

/s/ Patrick Duffey_____
NIXON PEABODY LLP
70 West Madison Street, Suite 3500
Chicago, IL 60602
P: 312-977-4400
F: 844-872-9569

# EXHIBIT

# 23

# UNITED STATES OF AMERICA
# CONSUMER FINANCIAL PROTECTION BUREAU

ADMINISTRATIVE PROCEEDING

File No. 2015-CFPB-0028

| | |
|---|---|
| In the Matter of:<br><br>**General Information Services, Inc., and e-Backgroundchecks.com, Inc.** | **CONSENT ORDER** |

The Consumer Financial Protection Bureau (Bureau) has reviewed the procedures by which General Information Services, Inc. (GIS) and e-Backgroundchecks.com, Inc. (BGC) (collectively Respondents, as defined below) generate and provide employment background screening reports to employers and has identified the following law violations: (1) failure to employ reasonable procedures to assure maximum possible accuracy of the information in their reports in violation of section 607(b) of the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681e(b); (2) failure to meet the requirements of section 613(a) of the FCRA, 15 U.S.C. § 1681k(a), when reporting public record information that is likely to have an adverse effect on a consumer's ability to obtain employment; and (3) failure to exclude non-reportable information from employment background reports in violation of sections 605(a)(2) and (5) of the FCRA, 15 U.S.C. § 1681c(a)(2), (5). Under sections 1053 and 1055 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5563, 5565, the Bureau issues this Consent Order (Consent Order).

# I

## Jurisdiction

1.    The Bureau has jurisdiction over this matter under (a) sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563 and 5565; and (b) section 621 of the FCRA, 15 U.S.C. § 1681s(b)(1)(H).

# II

## Stipulation

2.    Respondents have executed a "Stipulation and Consent to the Issuance of a Consent Order," dated, October 28, 2015 (Stipulation), which is incorporated by reference and is accepted by the Bureau. By this Stipulation, Respondents have consented to the issuance of this Consent Order by the Bureau under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563 and 5565, without admitting or denying any of the findings of fact or conclusions of law, except that Respondents admit the facts necessary to establish the Bureau's jurisdiction over them and the subject matter of this action.

# III

## Definitions

3.    The following definitions apply to this Consent Order:

a.    "Affected Consumers" means the following categories of consumers, except for those consumers who previously released the applicable Respondent with respect to the reports that would otherwise qualify them for membership in the class:

(a) Class 1: Those approximately 4,900 consumers who disputed their criminal background report prepared by GIS at any time between July 21, 2011 and December 31, 2014, and whose dispute resulted in a change of Grade, as defined below, from FAIL to PASS, or from FAIL to REVIEW, and then to PASS, following a further review of the dispute;

(b) Class 2: Those approximately 6,300 consumers who disputed their BGC criminal background report at any time between July 21, 2011 and December 31, 2014, and

whose dispute resulted in a change or correction to the report for the following reasons: (a) BGC reported a criminal record that did not belong to the consumer, including, without limitation, those criminal records that BGC could not confirm belonged to the consumer based on personal identifiers, or (b) BGC reported inaccurate criminal record information about the consumer, including, without limitation, expunged records, dismissed charges, *nolo prosequi* records reported as convictions, or records with incorrect disposition data.

(c) <u>Class 3</u>: Those approximately 300 consumers about whom GIS and BGC reported non-reportable civil-suit or civil-judgment information in violation of section 605(a) of the FCRA, 15 U.S.C. § 1681c(a), at any time between July 21, 2011 and December 31, 2014, excluding those consumers as to whom Respondents provide to the Bureau, within 60 days of the Effective Date, a sworn statement from the employer who requested the report confirming pursuant to 15 U.S.C. § 1681c(b)(3) that the annual salary for the position associated with the report was $75,000 or more.

b.  "Bureau" means Consumer Financial Protection Bureau.

c.  "Consumer Report" means a "consumer report," as that term is defined in section 603(d) of the FCRA, 15 U.S.C. § 1681a(d).

d.  "Consumer Reporting Agencies" or "CRAs" means a "consumer reporting agency," as that term is defined in section 603(f) of the FCRA, 15 U.S.C. § 1681a(f).

e.  "Clearly and prominently" means:

   i.  In textual communications (e.g., printed publications or words displayed on the screen of an electronic device), the disclosure must be of a type size and location sufficiently noticeable for an ordinary consumer to read and comprehend it, in print that contrasts with the background on which it appears; and

    ii.   In communications made through interactive media such as the internet, online services, and software, the disclosure must be unavoidable and presented in a form consistent with subsection (i).

f.   "Effective Date" means the date on which the Consent Order is issued.

g.   "Enforcement Director" means the Assistant Director of the Office of Enforcement for the Consumer Financial Protection Bureau, or his/her delegate.

h.   "Grade" means the designation of PASS, FAIL, OR REVIEW assigned to a consumer's background report by GIS or the employer based on criteria selected by a current or prospective employer.

i.   "Related Consumer Action" means a private action by or on behalf of one or more consumers or an enforcement action by another governmental agency brought against Respondents based on substantially the same facts as described in Section IV of this Consent Order.

j.   "Relevant Period" includes the period from July 21, 2011 to December 31, 2014.

k.   "Respondents" means General Information Services, Inc. and e-Backgroundchecks.com, Inc., also d/b/a Backgroundchecks.com and Backgroundchecksforschools.com, including all successors and assigns.

## IV

## Bureau Findings and Conclusions

The Bureau finds the following:

4.   Respondents are Consumer Reporting Agencies (CRAs), as defined by the FCRA.

5.   As CRAs, Respondents are engaged primarily in generating background screening reports for prospective employers throughout the United States with respect to individual job candidates.

6.    The background screening reports that Respondents generate are "consumer reports" as defined by section 603(d) of the FCRA, 15 U.S.C. § 1681a(d).

7.    The Bureau has general enforcement authority with respect to persons subject to the FCRA pursuant to section 1681s(b)(1)(H), including CRAs.

**Failure to Employ Reasonable Procedures to Assure Maximum Possible Accuracy**

8.    Section 607(b) of the FCRA provides that whenever a consumer reporting agency prepares a report, it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates. 15 U.S.C. §1681e(b).

9.    Since at least July 21, 2011, Respondents failed to meet the requirements of section 607(b). 15 U.S.C. § 1681e(b).

10.   In particular, Respondents failed to have written procedures for researching public records information for consumers with common names or who use nicknames.

11.   Instead, Respondents allowed its employees to use their discretion in determining whether a record matched consumers with common names and nicknames.

12.   Further, GIS permits, but does not require, employers to provide middle names for applicants for purposes of matching criminal records to consumers.

13.   These procedures resulted in the reporting of mismatched criminal record information about consumers.

14.   Further, between at least July 21, 2011 and December 31, 2014, Respondents did not use consumer dispute data to identify the root causes of accuracy errors to inform their researching and reporting procedures.

15.   Respondents failed to analyze available consumer dispute data to determine, among other things, whether certain jurisdictions had data integrity problems, ascertain when a specific reporting procedure was causing reporting errors, or recognize when a particular employee was making significant mistakes.

16.    Respondents' internal departments failed to meet on a regular basis to discuss errors observed in the Consumer Relations Division and ways to prevent those errors.

17.    Further, BGC failed to track the outcome of consumer disputes in a manner which would allow it to easily identify trends or pinpoint reporting errors.

18.    For a six month period in 2013, BGC did not contemporaneously log the outcome of consumer disputes.

19.    Respondents also failed to conduct sufficient testing or sampling of their non-disputed reports to assure that the information they report meets the requirement of maximum possible accuracy.

20.    GIS tests two reports approximately every six weeks for each of its internal and external researchers.

21.    The process involves reassigning the two chosen reports to the same researcher to rerun the reports and confirm that the same records are returned.

22.    This procedure is not reasonable for several reasons. First, it tests only whether the records identified in a new search of potential matches are the same records identified in the original search – not whether the information included in the final report is lawful. Second, it fails to assess why certain non-reportable or mismatched information is included in reports. Third, testing two cases per researcher every six weeks is not based on any predictive algorithm or tested method.

23.    BGC does not conduct any testing of the accuracy of non-disputed reports at all.

24.    Additionally, GIS failed to prevent potentially knowable errors from possibly appearing on consumers' reports.

25.    GIS possesses certain proprietary software that identifies discrepancies in data across multiple traditional criminal history reports.

26.  For example, this software could identify a record that was previously suppressed from a report because it had been dismissed or expunged and prevent it from appearing on a future report.

27.  GIS employed this software only within the pool of reports prepared for each client, rather than on a consumer-wide basis.

28.  Therefore, if a consumer applied for a new job with a different employer, and GIS prepared the new background report, GIS would not employ this software to identify possible errors and prevent inconsistencies from appearing on the new report.

29.  The Bureau finds that for all of the reasons stated above, Respondents have failed to follow reasonable procedures to assure maximum possible accuracy of the information they report in violation of section 607(b) of the FCRA, 15 U.S.C. 1681e(b).

### Failure to Meet the Requirements of Section 1681k of the FCRA

30.  The FCRA requires a consumer reporting agency that furnishes a consumer report for employment purposes containing public record information that is likely to have an adverse effect upon a consumer's ability to obtain employment to either (1) notify the consumer at the time the information is reported, or (2) maintain "strict procedures" designed to ensure that the information is complete and up to date. Section 613(a), 15 U.S.C. § 1681k(a).

31.  Since at least July 21, 2011, Respondents failed to meet the requirements of this provision of the FCRA.

32.  GIS states that it maintains "strict procedures" to assure that the information it reports is complete and up-to-date.

33.  However, its procedures for complying with section 613, 15 U.S.C. § 1681k, are no different than its procedures for complying with the requirements of section 607(b), 15 U.S.C. §1681e(b) – reasonable procedures to assure maximum possible accuracy.

34. Therefore, for the same reasons GIS violates the provisions of 607(b), 15 U.S.C. § 1681e(b), it also violates the more stringent requirements of 613(k), 15 U.S.C. § 1681k.

35. BGC offers two different types of employment background screening reports: verified and unverified. For its verified product, BGC utilizes GIS to research and validate the records identified as matches.

36. Accordingly, for its verified product, BGC's procedures also violate the provisions of 613(k) for the same reasons as GIS.

**Failure to Exclude Non-Reportable Information from Background Reports**

37. The FCRA provides generally that a CRA may generate a consumer report containing, *inter alia*, civil suits and civil judgments and records of arrest, except to the extent such items antedate the report by more than seven years, or the applicable statute of limitations, whichever is longer. 605(a)(2), 15 U.S.C. § 1681c(a)(2).

38. The FCRA provides that a CRA may report other adverse, non-conviction items of information, except to the extent the adverse item antedates the report by more than seven years. 605(a)(5), 15 U.S.C. § 1681c(a)(5).

39. Respondents did not have sufficient policies and procedures to ensure that their background reports exclude this type of aged information in civil litigation searches.

40. Between July 2011 and January 2014, Respondents included civil-suit and civil-judgment information that antedated the report by more than seven years in consumers' reports which, to the extent that no salary-based exception applied, was a violation of sections 1681c(a)(2), (5) of the FCRA.

## ORDER
## V
## Conduct Provisions

**IT IS ORDERED**, under sections 1053 and 1055 of the CFPA, that:

41.  Respondents, their officers, agents, servants, employees, and attorneys who have actual
     notice of this Consent Order, whether acting directly or indirectly, may not violate sections
     605(a)(2) and (5), 607(b), and 613(a) of the Fair Credit Reporting Act (FCRA), 15 U.S.C. §§
     1681c(a)(2) and (5), 1681e(b), 1681k(a), as follows and must take the following affirmative
     actions:

     a.  Develop and implement a comprehensive audit program, as detailed in Section VI;

     b.  Develop and implement policies and procedures to exclude certain non-reportable
         information from background reports, as proscribed by section 605(a)(2) and (5) of the
         FCRA, 15 U.S.C. § 1681c, as detailed in Section VI;

     c.  Develop and implement procedures to comply with section 607(b) of the FCRA, 15 U.S.C. §
         1681e(b), to assure maximum possible accuracy of the information contained in
         Respondents' background reports, as detailed in Section VI; and

     d.  Develop and implement policies and procedures to comply with section 613(a) of the FCRA,
         15 U.S.C. § 1681k(a), when reporting public record information likely to have an adverse
         effect on a consumer's ability to obtain employment, as detailed in Section VI.

## VI
## Compliance Plan

**IT IS FURTHER ORDERED** that:

42.  Within 15 days of the Effective Date, Respondents shall submit the names and curriculum
     vitae of one or more independent consultants, with specialized experience in compliance
     with the FCRA, to the Enforcement Director, who shall have the discretion to make a
     determination of non-objection. The Enforcement Director shall make such determination

within 10 days, or direct the Respondents to select one or more different independent consultants. If the Enforcement Director directs the Respondents to select one or more different independent consultants, the Respondents shall do so within 10 days, and submit the names and curriculum vitae of the newly identified independent consultant(s) to the Enforcement Director, who may then make a determination of non-objection within 5 days.

43.    Within 15 days of the Enforcement Director's determination of non-objection, the Respondents shall engage the independent consultant (Independent Consultant) to review and assess the following:

a.  Respondents' policies, practices, and procedures relating to compliance with sections 605(a)(2) and (5), 607(b) and 613(a), 15 U.S.C. §§ 1681c, 1681e(b), 1681k;

b.  The sufficiency of Respondents' staffing, facilities, and systems relative to the nature, size, complexity and scope of Respondents' activities;

c.  The adequacy of any other administrative, technical and physical safeguards, including, at a minimum, Respondents' procedures related to data entry by the Records Entry Department; and

d.  Any other policies, practices or procedures which may affect Respondents' obligations pursuant to sections 605(a)(2) and (5), 607(b) and 613(a), 15 U.S.C. §§ 1681c, 1681e(b), 1681k.

44.    Based on that review and assessment, the Independent Consultant shall make written recommendations for changes and improvements to Respondent's policies, practices and procedures relating to sections 605(a)(2) and (5), 607(b) and 613(a) to meet Respondents' obligations under the FCRA (Independent Consultant Recommendations).

45.    Within 90 days of the Enforcement Director's determination of non-objection, based on the Independent Consultant Recommendations, Respondents shall develop revisions to their current policies, practices, and procedures to achieve compliance with 605(a)(2) and (5),

607(b) and 613(a), 15 U.S.C. §§ 1681c, 1681e(b), 1681k (Compliance Plan). To the extent that Respondents do not incorporate all of the recommendations of the Independent Consultant into the Compliance Plan, Respondents shall specify which recommendations the Compliance Plan does not adopt, the reason why such recommendations have not been included, and how excluding such recommendations affects Respondents' compliance with sections 605(a)(2) and (5), 607(b) and 613(a), 15 U.S.C. §§ 1681c, 1681e(b), 1681k.

46.    The Compliance Plan shall include, at a minimum, the following:

a.  Revisions to Respondents' policies, practices, and procedures for complying with sections 605(a)(2) and (5) of the FCRA, 15 U.S.C. § 1681c(a)(2) and (5), including, at a minimum, the following:

  1.  Excluding from consumer reports civil suits and civil judgments that antedate a report by more than seven years, or until the governing statute of limitations period has expired, whichever is longer; and

  2.  Excluding from consumer reports other adverse information, other than records of conviction of crimes, that antedate the report by more than seven years.

b.  Revisions to Respondents' procedures for complying with  sections 607(b) and 613(a)(2), 15 U.S.C. § §1681e(b), 1681k(a)(2), including, at a minimum, the following:

  1.  Using matching logic and algorithms appropriate to the nature, complexity, and size of Respondents' activities and designed to assure maximum possible accuracy of the information reported, including, at a minimum, use of middle names for matching public records to consumers, including affirmatively matching middle names when provided, or in the event an applicant's middle name is not provided, deriving a middle name by running a social security trace and using the middle name from records matching an applicant's first name, last name, and social security number to affirmatively match criminal records with the same first, middle, and last names with

one or more additional personal identifiers, such as date of birth or social security number; algorithms for distinguishing records by middle name; algorithms for matching common names; algorithms for matching nicknames; and algorithms to distinguish between names that vary by generational suffix;

2. Using software to compare and reconcile discrepancies in criminal records in all reports generated, not just across reports generated for the same employer;

3. Using consumer dispute data to improve accuracy in reporting, including, at a minimum, the following:

    a. Analyzing consumer dispute data on at least a monthly basis to determine the root causes of errors in reporting;

    b. Holding meetings at least monthly between the Consumer Relations, Quality Assurance, Public Records, Public Records Entry, and Compliance departments to discuss the results of the consumer dispute analysis and any solutions to errors identified; and

    c. Implementing any solutions developed at the monthly meetings.

4. Developing a comprehensive audit program (Audit Program), in writing, which shall:

    a. Test the accuracy, integrity, and completeness of the public-record information sourced to generate Respondents' background reports, including, at a minimum, the following:

        i. Purchased bulk data information;

        ii. Information obtained from online sources;

        iii. Information maintained in proprietary databases;

        iv. Information returned by external researchers;

        v. Information returned by internal researchers; and

        vi. Any other sources of public record information used by Respondents.

      b.   Test the accuracy, integrity, and completeness of the public-record information contained in the final background reports Respondents provide to employers, including corrected or updated background reports Respondents provide to employers following a consumer dispute;

      c.   Designate an employee or employees to oversee the Audit Program;

      d.   Train personnel to perform the Audit Program's requirements; and

      e.   Use the results of the Audit Program to determine the root causes of errors in accuracy and develop and implement solutions to identified errors to achieve maximum possible accuracy of the information Respondents report.

5. Implementing the Audit Program at a frequency necessary to test reliably the accuracy of Respondents' background reports, sounded in a statistical algorithm based on the number of reports Respondents generate yearly.

6. Regularly evaluating and adjusting the Audit Program in light of the results and any material changes to Respondents' operations or business arrangements that may significantly impact the Audit Program, or any other circumstances that Respondents know or have reason to know may have an impact on the accuracy of the information Respondents report. In no event shall this evaluation take place less than every 6 months.

7. Developing any additional procedures necessary to assure compliance with 607(b) and, in instances where Respondents do not send pre-adverse action notices pursuant to section 613(a)(1), 15 U.S.C. § 1681k(a)(1), and instead elect to maintain strict procedures designed to insure that public record information that is likely to have an adverse effect on a consumer's ability to obtain employment is complete and up to date pursuant to 613(a)(2), 15 U.S.C. §1681k(a)(2), developing any additional procedures necessary to assure compliance with that section.

8. Developing any additional procedures necessary to assure compliance with 607(b) and 613(a) based on the recommendations set forth in the Independent Consultant Recommendations.

47. Within 90 days of the Enforcement Director's determination of non-objection to the Independent Consultant, Respondents shall submit the Compliance Plan and a copy of the Independent Consultant Recommendations to the Enforcement Director, who will have the discretion to make a determination of non-objection to the Compliance Plan or to direct the Respondents to revise it. If the Enforcement Director directs the Respondents to revise the Compliance Plan, they must make the requested revisions and resubmit the Compliance Plan to the Enforcement Director within 20 days.

48. Within 15 days of receiving notification that the Enforcement Director has made a determination of non-objection to the Compliance Plan, the Respondents must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Plan.

## VIII
## Order to Pay Redress

**IT IS FURTHER ORDERED** that:

49. Within 10 days of the Effective date, Respondents must reserve or deposit into a segregated deposit account $10, 500,000 for the purpose of providing redress to Affected Consumers, as required by this Section.

50. Within 45 days of the Effective Date, Respondents must each submit to the Enforcement Director for review and non-objection a comprehensive written plan for providing redress consistent with this Consent Order (Redress Plan). The Enforcement Director will have the discretion to make a determination of non-objection to the Redress Plan or direct the Respondents to revise them. If the Enforcement Director directs the Respondents to revise

the Redress Plan, the Respondents must make the revisions and resubmit the Redress Plan to the Enforcement Director within 15 days. After receiving notification that the Enforcement Director has made a determination of non-objection to the Redress Plan, the Respondents must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Redress Plan.

51.  The Redress Plan must:

  a.  Specify how Respondents will identify all Affected Consumers who will receive redress under this Consent Order;

  b.  Include the form of letter and envelope to be sent notifying Affected Consumers of the redress;

  c.  Provide that Respondents shall pay all costs of administering redress as required by this Section;

  d.  Require Respondents to compensate each Affected Consumer within 30 days, as follows:

   i.  $1,000 for each Class 1 Affected Consumer;

   ii.  $1,000 for each Class 2 Affected Consumer; and

   iii.  $1,000 for each Class 3 Affected Consumer.

  e.  In the event the total payments to Affected Consumers pursuant to paragraph 51(d)(i)-(iii) equals an amount greater than $10,500,000, the amount paid to each Affected Consumer may be reduced *pro rata*; and

  f.  In the event the Respondents are unable to locate an Affected Consumer, or an Affected Consumer fails to deposit and cash a redress check from Respondents within 180 days of implementation of the Compliance Plan, Respondents shall aggregate the redress payments that would have been made to such Affected Consumers, and redistribute that amount to the remaining Affected Consumers on a *pro rata* basis.

52.  After completing the Redress Plan, if the amount of redress provided to Affected Consumers is less than $10,500,000, within 30 days of the completion of the Redress Plan, Respondents must pay to the Bureau, by wire transfer to the Bureau or to the Bureau's agent, and according to the Bureau's wiring instructions, the difference between the amount of redress provided to Affected Consumers and $10,500,000, so that such funds may be distributed to the U.S. Treasury as disgorgement.

53.  Respondents may not condition the payment of any redress to any Affected Consumer under this Order on that Affected Consumer waiving any right.

## IX
## Order to Pay Civil Money Penalties

**IT IS FURTHER ORDERED** that:

54.  Under section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in Section IV of this Consent Order, and taking into account the factors in 12 U.S.C. § 5565(c)(3), GIS must pay a civil money penalty of $1,250,000 to the Bureau and BGC must pay a civil money penalty of $1,250,000 to the Bureau, for a total of $2,500,000.

55.  Within 30 days of the Effective Date, Respondents must pay the civil money penalty by wire transfer to the Bureau or to the Bureau's agent in compliance with the Bureau's wiring instructions.

56.  The civil money penalty paid under this Consent Order will be deposited in the Civil Penalty Fund of the Bureau as required by section 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

57.  Respondents must treat the civil money penalty paid under this Consent Order as a penalty paid to the government for all purposes. Regardless of how the Bureau ultimately uses those funds, Respondents may not:

   a.  Claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Consent Order; or

b. Seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made under any insurance policy, with regard to any civil money penalty paid under this Consent Order.

58. To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, Respondents may not argue that Respondents are entitled to, nor may Respondents benefit by, any offset or reduction of any compensatory monetary remedies imposed in the Related Consumer Action because of the civil money penalty paid in this action (Penalty Offset). If the court in any Related Consumer Action grants such a Penalty Offset, Respondents must, within 30 days after entry of a final order granting the Penalty Offset, notify the Bureau, and pay the amount of the Penalty Offset to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action.

# X
## Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

59. In the event of any default on Respondents' obligations to make payment under this Consent Order, interest, computed under 28 U.S.C. § 1961, as amended, will accrue on any outstanding amounts not paid from the date of default to the date of payment, and will immediately become due and payable.

60. Respondents must relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law and no part of the funds may be returned to Respondents.

61. Under 31 U.S.C. § 7701, Respondent, unless it already has done so, must furnish to the Bureau its taxpayer identifying numbers, which may be used for purposes of collecting and reporting on any delinquent amount arising out of this Consent Order.

62. Within 30 days of the entry of a final judgment, consent order, or settlement in a Related Consumer Action, Respondents must notify the Enforcement Director of the final judgment,

consent order, or settlement in writing. That notification must indicate the amount of redress, if any, that Respondents paid or are required to pay to consumers and describe the consumers or classes of consumers to whom that redress has been or will be paid.

## XI

## Reporting Requirements

**IT IS FURTHER ORDERED** that:

63. Respondents must notify the Bureau of any development that may affect their compliance with obligations arising under this Consent Order, including but not limited to, a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Consent Order; the filing of any bankruptcy or insolvency proceeding by or against Respondent; or a change in Respondents' name or address. Respondents must provide this notice, if practicable, at least 30 days before the development, but in any case no later than 14 days after the development.

64. Within 7 days of the Effective Date, Respondents must designate at least one telephone number and email, physical, and postal address as points of contact, which the Bureau may use to communicate with Respondents.

65. Respondents must report any change in the information required to be submitted under Paragraph 63 at least 30 days before the change or as soon as practicable after the learning about the change, whichever is sooner.

66. Respondents must submit to the Enforcement Director an accurate written compliance progress report and assessment (Compliance Report) within 120 days after implementation of the Compliance Plan, and annually thereafter for 5 years after the Effective Date. The Compliance Report shall, at a minimum:

    a.    Set forth the specifics of the Compliance Plan that Respondents have implemented and maintained during the reporting period;

    b.    Explain whether the Compliance Plan is appropriate to Respondents' size and complexity;

    c.    Provide an analysis of whether the Compliance Plan has resulted in compliance with sections 605(c)(a), 607(b), and 613(a), 15 U.S.C. §§ 1681c, 1681e(b), and 1681k; and

    d.    Provide an analysis of the results of the Audit Program.

67.    The first annual Compliance Report shall be accompanied by a letter from the Independent Consultant evaluating the implementation and efficacy of the Compliance Plan.

68.    Within 90 days after the Effective Date and again one year after the Effective Date, Respondents shall submit a copy of each Order Acknowledgment obtained under Section XII, unless previously submitted to the Bureau.

# XII

## Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that,

69.    Within 30 days of the Effective Date, Respondents must deliver a copy of this Consent Order to each of its board members and executive officers, as well as to any managers, employees, or other agents and representatives who have responsibilities related to the subject matter of the Consent Order.

70.    For 5 years from the Effective Date, Respondents must deliver a copy of this Consent Order to any business entity resulting from any change in structure referred to in Section XI, any future board members and executive officers, as well as to any managers, employees, or other agents and representatives who will have responsibilities related to the subject matter of the Consent Order before they assume their responsibilities.

71. Respondents must secure a signed and dated statement acknowledging receipt of a copy of this Consent Order, ensuring that any electronic signatures comply with the requirements of the E-Sign Act, 15 U.S.C. § 7001 *et seq.*, within 30 days of delivery, from all persons receiving a copy of this Consent Order under this Section.

## XIII
## Recordkeeping

**IT IS FURTHER ORDERED** that

72. Respondents must create, or if already created, must retain for at least 5 years from the Effective Date, the following business records:

   a. All documents and records necessary to demonstrate full compliance with each provision of this Consent Order, including all submissions to the Bureau.

   b. All documents and records pertaining to the Redress Plan, described in Section VIII above.

73. Respondents must retain the documents identified in Paragraph 72 for the duration of the Consent Order.

74. Respondents must make the documents identified in Paragraph 72 available to the Bureau upon the Bureau's request.

## XIV
## Notices

**IT IS FURTHER ORDERED** that:

75. Unless otherwise directed in writing by the Bureau, Respondents must provide all submissions, requests, communications, or other documents relating to this Consent Order in writing, with the subject line, "*In re General Information Services, Inc., et al.*, File No. 2015-CFPB-0028          ." and send them either:

a. By overnight courier (not the U.S. Postal Service), as follows:

> Assistant Director for Enforcement
> Consumer Financial Protection Bureau
> ATTENTION: Office of Enforcement
> 1625 Eye Street, N.W.
> Washington D.C. 20006; or

b. By first-class mail to the below address and contemporaneously by email

> to Enforcement_Compliance@cfpb.gov:

> Assistant Director for Enforcement
> Consumer Financial Protection Bureau
> ATTENTION: Office of Enforcement
> 1700 G Street, N.W.
> Washington D.C. 20552

## XV

## Cooperation with the Bureau

**IT IS FURTHER ORDERED** that:

76. Respondents must cooperate fully to help the Bureau determine the identity and location of each Affected Consumer. Respondents must provide such information in their or their agents' possession or control within 14 days of receiving a written request from the Bureau.

## XVI

## Compliance Monitoring

**IT IS FURTHER ORDERED** that, to monitor Respondents' compliance with this Consent Order:

77. Within 14 days of receipt of a written request from the Bureau, Respondents must submit additional Compliance Reports or other requested information, which must be made under penalty of perjury; provide sworn testimony; or produce documents.

78. Respondents must permit Bureau representatives to interview, in relation to compliance with this Order, any employee or other person affiliated with Respondents who have agreed to such an interview. The person interviewed may have counsel present.

79. Nothing in this Consent Order will limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

## XVII
## Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED** that:

80. Respondents may seek a modification to non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Enforcement Director.

81. The Enforcement Director may, in his/her discretion, modify any non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) if he/she determines good cause justifies the modification. Any such modification by the Enforcement Director must be in writing.

## XVIII
## Administrative Provisions

82. The provisions of this Consent Order do not bar, estop, or otherwise prevent the Bureau, or any other governmental agency, from taking any other action against Respondent, except as described in Paragraph 83.

83. The Bureau releases and discharges Respondents from all potential liability for law violations that the Bureau has or might have asserted based on the practices described in Section IV of this Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. The Bureau may use the practices described in this Consent Order in future enforcement actions against Respondents and their affiliates, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty. This release does not preclude or affect any right of the Bureau to determine and ensure

compliance with the Consent Order, or to seek penalties for any violations of the Consent Order.

84. This Consent Order is intended to be, and will be construed as, a final Consent Order issued under section 1053 of the CFPA, 12 U.S.C. § 5563, and expressly does not form, and may not be construed to form, a contract binding the Bureau or the United States.

85. This Consent Order will terminate 5 years from the Effective Date or 5 years from the most recent date that the Bureau initiates an action alleging any violation of the Consent Order by Respondents. If such action is dismissed or the relevant adjudicative body rules that Respondents did not violate any provision of the Consent Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the Consent Order will terminate as though the action had never been filed. The Consent Order will remain effective and enforceable until such time, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

86. Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted.

87. Should Respondents seek to transfer or assign all or part of their operations that are subject to this Consent Order, Respondents must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Consent Order.

88. The provisions of this Consent Order will be enforceable by the Bureau. For any violation of this Consent Order, the Bureau may impose the maximum amount of civil money penalties allowed under section 1055(c) of the CFPA, 12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve Respondents wherever Respondents may be found and Respondents may not contest that court's personal jurisdiction over Respondents.

89.   This Consent Order and the accompanying Stipulation contain the complete agreement
      between the parties. The parties have made no promises, representations, or warranties
      other than what is contained in this Consent Order and the accompanying Stipulation. This
      Consent Order and the accompanying Stipulation supersede any prior oral or written
      communications, discussions, or understandings.

90.   Nothing in this Consent Order or the accompanying Stipulation may be construed as
      allowing the Respondents, their officers, or employees to violate any law, rule, or regulation.

**IT IS SO ORDERED**, this 29 th day of October, 2015.


                              Richard Cordray
                              Director
                              Consumer Financial Protection Bureau

# EXHIBIT

# 24

# UNITED STATES OF AMERICA
## CONSUMER FINANCIAL PROTECTION BUREAU

**File No. &S%-CFPB-SS&**

| | |
|---|---|
| In the matter of:<br><br>**General Information Services, Inc.,<br>and e-Backgroundchecks.com, Inc.** | **STIPULATION AND CONSENT TO THE ISSUANCE OF A CONSENT ORDER** |

The Consumer Financial Protection Bureau (Bureau) intends to initiate an administrative proceeding against General Information Services, Inc. and e-Backgroundchecks.com, Inc. (Respondents), under 12 U.S.C. §§ 5563 and 5565, for their violations of sections 605(a)(2) and (5), 607(b) and 613(a) of the Fair Credit Reporting Act, 15 U.S.C. § § 1681c(a)(2) and (5), 1681e(b), 1681k. Respondents, in the interest of compliance and resolution of the matter, and without admitting or denying any wrongdoing, consent to the issuance of a Consent Order substantially in the form of the one to which this Stipulation and Consent to the Issuance of a Consent Order is attached (Consent Order), and which is incorporated by reference.

In consideration of the above premises, Respondents agree to the following:

## Jurisdiction

1. The Bureau has jurisdiction over this matter under sections 1053 and 1055 of the Consumer Financial Protection Act (CFPA), 12 U.S.C. §§ 5563, 5565.

## Consent

2. Respondents agree to the issuance of the Consent Order, without admitting or denying any of the findings of fact or conclusions of law, except that Respondents admit the facts necessary to establish the Bureau's jurisdiction over Respondents and the subject matter of this action.

3. Respondents agree that the Consent Order will be deemed an "order issued with the consent of the person concerned" under 12 U.S.C. § 5563(b)(4), and agree that the Order will become a final order, effective upon issuance, and will be fully enforceable by the Bureau under 12 U.S.C. §§ 5563(d)(1) and 5565.

4. Respondents voluntarily enter into this Stipulation and Consent to the Issuance of a Consent Order.

5. The Consent Order resolves only Respondents' potential liability for law violations that the Bureau asserted or might have asserted based on the practices described in Section IV of the Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. Respondents acknowledge that no promise or representation has been made by the Bureau or any employee, agent, or representative of the Bureau, about any liability outside of this action that may have arisen or may arise from the facts underlying this action or immunity from any such liability.

6. Respondents agree that the facts described in Section IV of the Consent Order will be taken as true and be given collateral estoppel effect, without further proof, in any proceeding before the Bureau to enforce the Consent Order, or in any subsequent civil litigation by the Bureau to enforce the Consent Order or its rights to any payment or monetary judgement under the Consent Order.

7. The terms and provisions of this Stipulation and the Consent Order will be binding upon, and inure to the benefit of, the parties hereto and their successors in interest.

8.  Respondents agree that the Bureau may present the Consent Order to the Bureau Director for signature and entry without further notice.

### Waivers

9.  Respondents, by consenting to this Stipulation, waive:

    a.  Any right to service of the Consent Order, and agree that issuance of the Consent Order will constitute notice to the Respondents of its terms and conditions;

    b.  Any objection to the jurisdiction of the Bureau, including, without limitation, under section 1053 of the CFPA, 12 U.S.C. § 5563;

    c.  The rights to all hearings under the statutory provisions under which the proceeding is to be or has been instituted; the filing of proposed findings of fact and conclusions of law; proceedings before, and a recommended decision by, a hearing officer; all post-hearing procedures; and any other procedural right available under section 1053 of the CFPA, 12 U.S.C. § 5563, or 12 CFR Part 1081;

    d.  The right to seek any administrative or judicial review of the Consent Order;

    e.  Any claim for fees, costs or expenses against the Bureau, or any of its agents or employees, and any other governmental entity, related in any way to this enforcement matter or the Consent Order, whether arising under common law or under the terms of any statute, including, but not limited to the Equal Access to Justice Act and the Small Business Regulatory Enforcement Fairness Act of 1996; for these purposes, Respondents agree that Respondents are not the prevailing parties in this action because the parties have reached a good faith settlement;

    f.  Any other right to challenge or contest the validity of the Consent Order;

    g.  Such provisions of the Bureau's rules or other requirements of law as may be construed to prevent any Bureau employee from participating in the preparation of, or advising the Director as to, any order, opinion, finding of fact, or conclusion of law to be entered in connection with this Stipulation or the Consent Order; and

h. Any right to claim bias or prejudgment by the Director based on the consideration of or

discussions concerning settlement of all or any part of the proceeding.

General Information Services, Inc.

BY:

_____      10/28/15

Raymond Conrad                                 Date

CEO, General Information Services, Inc. and

e-Backgroundchecks.com, Inc.

The undersigned of Director of General Information Services, Inc. and e-Backgroundchecks.com

acknowledges having read this Stipulation and the Consent Order, and approves of General

Information Services, Inc. and e-Backgroundchecks.com entering into this Stipulation.

_____      10/28/15

Jeanne Conrad                                  Date

Director, General Information Services, Inc. and

e-Backgrounchecks.com, Inc.

# EXHIBIT

# 25

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RAFAELA ALDACO, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:16-cv-05754 |
| | ) | |
| v. | ) | The Honorable Joan H. Lefkow |
| | ) | |
| RENTGROW, INC. d/b/a Yardi Resident | ) | |
| Screening, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## ANSWER TO PLAINTIFF'S COMPLAINT

Defendant RentGrow, Inc. d/b/a Yardi Resident Screening ("Defendant"), by its undersigned attorneys, submits the following Answer to Rafaela Aldaco's ("Plaintiff") Complaint:

## INTRODUCTION

1.      This is an action for damages brought by Rafaela Aldaco against RentGrow, Inc. for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, et seq.

**ANSWER:** Defendant admits that this paragraph accurately describes Plaintiff's causes of action against Defendant. Defendant denies the allegations of those causes of action, as set forth below.

## *The* PARTIES

2.      Plaintiff Rafaela Aldaco ("Ms. Aldaco") is an adult individual residing in the Northern District of Illinois. Ms. Aldaco is a single mother of two children.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 2.

1

3.     Defendant RentGrow, Inc. d/b/a Yardi Resident Screening (hereafter "RentGrow") is a consumer reporting agency doing business in the Northern District of Illinois, with its headquarters located at 307 Waverly Oaks Road, Suite 301, Waltham, MA 02452.

**ANSWER:**  Defendant admits that it is a corporation doing business in the Northern

District of Illinois and that the location of its headquarters is accurately described above.

Defendant denies that it is a "consumer reporting agency," in part because it lacks knowledge or

information sufficient to form a belief regarding the meaning of that term as used in paragraph 3.

4.     Upon information and belief, RentGrow maintains a database of information about consumers, including criminal records and other consumer information, and provides tenant screening reports to landlords and apartment management companies throughout the District.

**ANSWER:**  Defendant admits that it provides reports regarding potential tenants to

landlords and apartment management companies in the Northern District of Illinois.  Defendant

further admits that its reports include both criminal background and financial information.

Defendant denies the remainder of paragraph 4.

5.     Upon information and belief, RentGrow obtains the information in its database from third-party data providers.

**ANSWER:**  Defendant admits that it receives information from third parties in order to

generate reports.  Defendant denies the remainder of paragraph 4.

## JURISDICTION *and* VENUE

6.     Jurisdiction of this Court arises under 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

**ANSWER:**  Defendant admits that jurisdiction is proper in this Court.

7.     Venue lies properly in this district pursuant to 28 U.S.C. § 1391(b)(2) as this is the district in which a substantial part of the events or omissions giving rise to Ms. Aldaco's claim occurred.

**ANSWER:**   Defendant admits that venue is proper in this Court.  Defendant denies the

remaining allegations in paragraph 7.

2

## FACTUAL ALLEGATIONS

8.     In 1996, when Ms. Aldaco was 18 years old, she was involved in an altercation with her then-boyfriend.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 8.

9.     On December 17, 1996, as a result of the above-referenced altercation, Ms. Aldaco was given five days of community service and six months of court supervision.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 9.

10.     On June 17, 1997, Ms. Aldaco successfully completed her court supervision and the court discharged the supervision term.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 10.

11.     In January of 2016, almost 20 years later, Ms. Aldaco stood on the verge of entering a new chapter in her life. After years of struggling to make ends meet for herself and her family, she was accepted into a two-year transitional housing program for single mothers in danger of homelessness run by Fellowship Housing Corporation ("Fellowship"), a non-profit organization based in Hoffman Estates, Illinois.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 11.

12.     The Fellowship program is a two-year transitional housing program for single mothers and their children that provides housing placement, rental assistance, budgeting training, and debt repayment matching for its participants.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 12.

13.     To participate in Fellowship's program, applicants must undergo a criminal records background check. Fellowship requested a background report on Ms. Aldaco—which report did not contain any criminal background information—and accepted her into the program.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 13.

14.     Fellowship houses its participating families in one of two apartment buildings in the greater Hoffman Estates, Illinois area. In Ms. Aldaco's case, an apartment in one of the buildings had become available and Fellowship planned to place her there.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 14.

15.     On January 12, 2016, having packed all of her possessions into a moving truck the day before, Ms. Aldaco arrived at the apartment building with her Fellowship caseworker to move into her new home.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 15.

16.     The apartment building manager requested that Ms. Aldaco—at her expense—submit to an additional criminal background check to be conducted by a firm of the apartment building's choosing.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 16.

17.     The apartment building management obtained the report from RentGrow.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 15, in part because Plaintiff does not identify the apartment building referenced in her allegation.

18.     RentGrow's report contained obsolete information pertaining to Ms. Aldaco's 1996 court supervision (the "Information"), which RentGrow communicated to the apartment building management.

**ANSWER:** Defendant admits that it created a report regarding Plaintiff and that the report contained information pertaining to Ms. Aldaco's 1996 court supervision.   Defendant denies that the information was obsolete.  Defendant lacks knowledge or information sufficient

4

to form a belief regarding the truth of the remaining allegations in paragraph 18, in part because Plaintiff does not identify the apartment building referenced in her allegation.

19.     Upon receipt of RentGrow's report containing the Information, the apartment building management refused to lease to Ms. Aldaco.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 19.

20.     Having been denied a lease at the apartment building, Ms. Aldaco was forced to find temporary storage for her belongings, was unable to participate in Fellowship's program, and, most painful of all, required to inform her youngest child of the news that they were not going to be moving into permanent housing as planned.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 20.

21.     On or about January 12, 2016, Ms. Aldaco disputed the Information with RentGrow by e-mail, informing RentGrow that the Information was inaccurate.

**ANSWER:**     Defendant admits that, on or about January 12, 2016, Ms. Aldaco disputed the information with RentGrow by e-mail.  Defendant denies that the Information was inaccurate and denies the remainder of paragraph 21.

22.     On or about January 18, 2016, one Jayme Yellin, on behalf of RentGrow, responded to Ms. Aldaco's dispute, in relevant part, as follows:

> You previously contacted Yardi Resident Screening ("YRS") to dispute information contained in your tenant screening report ("TSR"). YRS submitted your dispute either to the credit reporting agency (such as Experian®, Equifax® or TransUnion®) or other consumer reporting agency ("CRA") that provided YRS with the information you disputed.
>
> The CRA recently completed its investigation of your dispute and determined that the information was reported accurately. This means YRS cannot modify or remove the information you disputed from your TSR. If you still question an item then you may want to contact the CRA directly, in this instance backgroundchecks.com whose phone number is (866)265-6602, or review the original information in the public record.

**ANSWER:** Defendant admits that, on or about January 18, 2016, Jayme Yellin sent an e-mail responding to Ms. Aldaco. Defendant admits that the text quoted in Paragraph 22 fairly and accurately represents an excerpt of Yellin's response. Defendant denies the remainder of paragraph 22.

23. As of the date of this Complaint, Ms. Aldaco has been unable to secure permanent, independent housing for herself and her minor child.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 23.

24. Due to RentGrow's inadequate procedures, it negligently, or in the alternative, willfully maintained the Information in Ms. Aldaco's background report.

**ANSWER:** Denied.

25. Due to RentGrow's inadequate procedures, it prepared a tenant screening report about Ms. Aldaco that contained obsolete criminal records information that is outdated and unreportable.

**ANSWER:** Denied.

26. RentGrow reported the Information to the apartment building management.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 26, in part because Plaintiff does not identify the apartment building referenced in her allegation.

27. At all times pertinent hereto, RentGrow was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the RentGrow.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 27, in part because Plaintiff does not identify either the acts alleged or the specific time period.

28.     At all times pertinent hereto, the conduct of the RentGrow, as well as that of its agents, servants and/or employees, was malicious, intentional, willful, reckless, and in grossly negligent disregard for federal and state laws and Ms. Aldaco's rights.

**ANSWER:**  Denied.

29.     As a result of RentGrow's conduct, Ms. Aldaco suffered actual damages, without limitation, as follows:
        A.     Denial of housing;
        B.     Moving costs;
        C.     Lost wages due to lost time at work;
        D.     Lost opportunities to participate in Fellowship's programming;
        E.     Lost opportunities to build relationships and obtain support and coaching from other mothers who have and art currently participating in Fellowship's programming;
        F.     Lost opportunities to obtain debt matching payments from Fellowship; and
        G.     Emotional distress.

**ANSWER:**  Denied.

## FIRST CLAIM *for* RELIEF
### *for* VIOLATIONS *of the* FAIR CREDIT REPORTING ACT
*Against RentGrow, Inc., d/b/a Yardi Resident Screening*

30.     Ms. Aldaco incorporates the foregoing paragraphs as though the same were set forth at length herein.

**ANSWER:**  Defendant incorporates by reference each of its answers to paragraphs 1 – 29 as though fully set forth herein.

31.     At all times pertinent hereto, RentGrow was a "person" and a "consumer reporting agency" as those terms are defined by 15 U.S.C. § 1681a(b) and (f).

**ANSWER:**  Paragraph 31 states legal conclusions to which no responses are required. To the extent a response is required, Defendant denies all allegations in paragraph 31.

32.     At all times pertinent hereto, Ms. Aldaco was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

**ANSWER:**  Admit.

33.     At all times pertinent hereto, the tenant screening reports provided by RentGrow were "consumer reports" as that term is defined by 15 U.S.C. § 1681a(d).

**ANSWER:**  Paragraph 33 states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies the allegations in paragraph 33.

34.     At all times pertinent hereto, Ms. Aldaco's 1996 court supervision was not a "conviction" under Illinois law. See 20 ILCS 2630/5.2(a)(1)(C).

**ANSWER:** Paragraph 34 states a legal conclusion to which no response is required.  To the extent a response is required, Defendant denies that the statute Plaintiff cites applies, and denies that the matter leading to the 1996 court supervision is not a "conviction" under Illinois law.  Defendant lacks knowledge or information sufficient to form a belief regarding the remaining allegations in paragraph 34, and the allegations are therefore denied.

35.     Although consumer reporting agencies may report "convictions of crimes" indefinitely under the FCRA, because the Information is not a "conviction," it may no longer be reported after seven years after June 17, 1997, the date the order of supervision was discharged. 15 U.S.C. § 1681c(a)(5).

**ANSWER:**  Paragraph 35 states a legal conclusion to which no answer is required.  To the extent an answer is required, Defendant denies the allegations in Paragraph 35.

36.     The FCRA prohibited reporting the Information after June 17, 2004.

**ANSWER:**  Paragraph 36 states a legal conclusion to which no answer is required.  To the extent an answer is required, Defendant denies the allegations in Paragraph 36.

37.     RentGrow violated the FCRA when it negligently, or in the alternative, willfully failed to follow reasonable procedures to prevent the maintenance of the Information in its files after December 18, 2004.

**ANSWER:**  Denied.

38.     RentGrow violated the FCRA when it negligently, or in the alternative, willfully maintained the Information in its files and communicated same to the apartment building management on January 12, 2016, more than 11 years after it became obsolete.

**ANSWER:**  Denied.

39.     RentGrow violated the FCRA when it negligently, or in the alternative, willfully failed to conduct a reasonable reinvestigation of the Information after Ms. Aldaco's disputation thereof.

**ANSWER:**  Denied.

40.     Pursuant to 15 U.S.C. § 1681n and 15 U.S.C. § 1681o, RentGrow is liable to Ms. Aldaco for willfully and negligently failing to comply with the requirements imposed on a consumer reporting agency pursuant to 15 U.S.C. § 1681e(b).

**ANSWER:**  Paragraph 40 states a legal conclusion to which no answer is required.  To the extent an answer is required, Defendant denies the allegations in Paragraph 40.

41.     The conduct of RentGrow was a direct and proximate cause, as well as a substantial factor, in bringing about the serious injuries, actual damages, and harm to Ms. Aldaco alleged above and, as a result, RentGrow is liable to Ms. Aldaco for the full amount of statutory damages, for actual damages, and for punitive damages, along with the attorneys' fees and the costs of this litigation, as well as such further relief as permitted by law.

**ANSWER:**  Paragraph 41 states a legal conclusion to which no answer is required.  To the extent an answer is required, Defendant denies the allegations in Paragraph 41.

42.     WHEREFORE, Plaintiff seeks judgment in Plaintiff's favor and damages against the RentGrow, based on the following requested relief:
           A.     Actual damages in an amount to be determined at trial;
           B.     Statutory damages of $1,000.00;
           C.     Punitive damages in an amount to be determined at trial;
           D.     Costs and reasonable attorneys' fees pursuant to 15 U.S.C. §§ 1681n, and 1681o; and
           E.     Such other and further relief as may be necessary, just and proper.

**ANSWER:**  Defendant denies that any relief for Plaintiff is appropriate or warranted in this case, and denies the remaining allegations in paragraph 42.

9

## JURY DEMAND

Defendant demands trial by jury on all issues so triable.

## AFFIRMATIVE DEFENSES

RentGrow, Inc. d/b/a Yardi Resident Screening, by its undersigned attorneys, submits the following affirmative defenses to Rafaela Aldaco's ("Plaintiff") Complaint:

1.      Defendant realleges and incorporates by reference its answers to paragraphs 1 – 42 as if fully set forth in these affirmative defenses.

## FIRST AFFIRMATIVE DEFENSE

2.      The alleged claims and purported claims for relief stated in the Complaint fail to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

3.      Plaintiff's claims are barred in whole or in part because she did not suffer any damages.

## THIRD AFFIRMATIVE DEFENSE

4.      Plaintiff's claims are barred in whole or in part because of her failure to mitigate her damages, if any.

## FOURTH AFFIRMATIVE DEFENSE

5.      To the extent Plaintiff has suffered or will suffer any damages, such damages were caused, in whole or in part, by the actions or omissions of other persons or entities over which Defendant had no control and for which Defendant is not liable, including, but not limited to credit reporting agencies or other consumer reporting agencies. In the event any fault of Defendant is found to have caused or contributed to cause any damages to Plaintiff, which is denied, any recovery against Defendant must be reduced and limited by the comparative fault of such persons or entities.

## FIFTH AFFIRMATIVE DEFENSE

6.     To the extent Plaintiff claims Defendant willfully violated the FCRA, which Defendant denies, any violation was not willful because Defendant's interpretation of the FCRA is not objectively unreasonable.  *See Safeco Ins. Co. of Am. v. Burr,* 551 U.S. 47, 70 (2007).

## SIXTH AFFIRMATIVE DEFENSE

7.     Plaintiff has no cause of action under 15 U.S.C. § 1681e(b) because Defendant at all times maintained and followed reasonable procedures to assure maximum possible accuracy of the information regarding Plaintiff.

## RESERVATION OF RIGHTS

7.     Defendant reserves the right to assert and rely on any other affirmative defenses that may become known to it as this case proceeds.


Dated:  August 30, 2016                             Respectfully submitted,


By:  /s/ Deanna R. Kunze


**Deanna R. Kunze (IL 6287513)**
dkunze@nixonpeabody.com
**NIXON PEABODY LLP**
70 West Madison, Suite 3500
Chicago, IL 60602
Tel:  312-977-4443
Fax:  844-560-8137

**Jason P. Gonzalez***
jgonzalez@nixonpeabody.com
**NIXON PEABODY LLP**
300 South Grand Avenue, Suite 4100
Los Angeles, California 90071
Tel:  213-629-6000
Fax: 213-629-6001
***Pro Hac Vice** application pending
Tel:  312-977-4443

11

Fax:  844-560-8137

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that the foregoing Answer to Plaintiff's Complaint was filed electronically on this 30th day of August in compliance with the General Order on Electronic Case Filing, Section III(B)(1).  As such, this document was served on all counsel who are deemed to have consented to electronic service.  Fed. R. Civ. P. 5(b)(2)(E) and Local Rule 5.9.


  */s/ Deanna R. Kunze*
Deanna R. Kunze