**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RAFAELA ALDACO, | ) |
| | ) Case No.: 1-16-CV-05754 |
| *Plaintiff,* | ) |
| | ) |
| v. | ) The Honorable Joan H. Lefkow |
| | ) |
| RENTGROW, INC. d/b/a Yardi Resident | ) |
| Screening, | ) |
| | ) |
| *Defendant.* | ) |

**PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF**
**UNDISPUTED AND DISPUTED FACTS AND SEPARATE STATEMENT OF**
**ADDITIONAL FACTS**

| | |
|---|---|
| 1. Defendant Rent Grow, Inc. d/b/a Yardi Resident Screening ("YRS") is a wholly-owned subsidiary of Yardi Systems, Inc. YRS provides background reports regarding potential tenants to landlords and apartment management companies. (Ex. 3/8/2017 Hennessey Dep. at 53:7-8; Ex. 25, Answer to Compl. 4.) YRS's corporate headquarters are located in Waltham, Massachusetts. (Ex. 25, Answer to Compl.) YRS conducts business in the Northern District of Illinois. *(Id.)* | Undisputed. |
| 2. Plaintiff Rafaela Aldaco is an adult resident of Hanover Park, Illinois, which is situated in the Northern District of Illinois. (*See* Ex. 31, Compl. 2; Ex. 32, Plf. Resp. to Interrogs.) | Undisputed. |
| 3. On June 1, 2016, Plaintiff filed this suit against YRS based upon alleged violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.* (*See* Ex. 31, Compl.) Specifically, Plaintiff claims that YRS negligently or willfully failed to maintain and | Disputed. Plaintiff alleges YRS negligently and willfully violated the FCRA §§ 1681c(a)(5), 1681e(b) and 1681i. (*See* Ex. 31. Compl.) |

| | |
|---|---|
| follow "reasonable procedures" in violation of 15 U.S.C. § 1681e(b). (*See* Ex. 31, Compl. 37-38.) Plaintiff also claims that YRS negligently or willfully failed to conduct a reasonable reinvestigation of Plaintiff's dispute in violation of 15 U.S.C. § 1331. (*See* Ex. 25, Answer to Compl. 6) | |
| 4. Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b)(2). (*See* Ex. 25, Answer to Compl. 7). | Undisputed. |
| **II. YRS's Tenant Screening Business** | |
| 5. YRS, a reseller consumer reporting agency, produces consumer reports pertaining to the histories of potential tenants for landlords and apartment management companies. (Ex. 1, 3/8/2017 Hennessey Dep. at 13:20-23; Ex. 25, Answer to Compl. 4.) YRS has been in business since 1989. (Ex. 1, 3/8/2017 Hennessey Dep. at 16:7-8.) | Plaintiff disputes that YRS is a reseller.  YRS is a non-reseller CRA because it stores and maintains data in its database, and because it creates new information to place on a consumer report, information not obtained from any other source.  (Ex. 1 3/8/17 Hennessey Dep. 144:23-145:7; 32:24-33:8; 95:2-5; 96:19-97:2; 42:11-20; Ex. 1 Hennessey Dep. 3/9/17 7:21; 6:14-20; 7:2-12; Ex. 11).  Plaintiff does not dispute that YRS has been in business since 1989. |
| 6. YRS provides these Resident Screening services through its proprietary web portals, including its Yardi Voyager ® software, through which a tenant screening report, or Applicant File- i.e. a document that contains data regarding a potential tenant on a property- is generated. (Ex. 30, YRS Process Overview at RG000067-68.) The tenant screening report contains data from different types of searches requested by YRS's clients, such as credit history and criminal background history. The data comes from various data providers with whom YRS does | Plaintiff does not dispute that YRS provides Resident Screening services through its proprietary web portals.  Plaintiff disputes the characterization that the Applicant file is a document that contains data regarding a potential tenant on a property.  The Applicant File stores raw data YRS receives from vendors.  (Ex.1 Hennessey Dep. 3/8/17 144:23-145:7; 95:2-5; 96:19-97:2.) |

| | |
|---|---|
| business. The types of data that may be included are credit data, criminal history data, civil court data, rental history data, and data from the Office of Foreign Asset Control. (Ex. 1, 3/8/2017 Hennessey Dep. at 21:17-22:13.) | |
| 7. YRS does not make leasing decisions. The decision to rent an apartment is solely that of the property's landlord. YRS simply provides data that its clients use to make leasing decisions. (Ex. 1, 3/8/2017 Hennessey Dep. at 27:10-13.) | Disputed. YRS evaluates data received from its sources and notifies the management company if the prospective tenant qualifies to rent a property. (Ex. 1, 3/8/17 Hennessey Dep. 42:11-20). |
| 8. Specifically, YRS clients (i.e. rental properties) provide decision criteria to YRS specifying tenant background information such as credit history and criminal history. (Ex. 30, YRS Process Overview at RG000065; Ex. 17, BH Management Resident Screening Criteria at RG00239.) Those criteria then are imported into the YRS software system for that specific property. (*Id*.) When an end-user, (i.e. property manager, leasing agent, or other housing specialist) then requests a background screening check for a potential tenant, the results from the background check are filtered through the property's criteria set. (*Id*.) For the Premium services, which were used by the property at issue here, the YRS Public Records Analyst then marks the result either "Meets Property Requirements" or "Does Not Meet Property Requirements." (*Id*; Ex. 14, 1/12/16 J. Yellin E-mail and Attachments at RG 000055.) | Disputed only to the extent that the Public Records Analysts evaluates the data it receives in order to determine he/she should report that the prospective tenant has met the property's requirements. (Ex. 1 3/8/17 Hennesey Dep. 34:11-16). |
| **III. YRS Maintains Reasonable Policies and Procedures to Ensure the Accuracy of the Information it Reports** | |

| | |
|---|---|
| 9. YRS maintains reasonable policies and procedures to ensure the maximum possible accuracy of reportable civil and criminal public records information pursuant to the requirements of the Fair Credit Report Act. (Ex. 1, 3/8/2017 Hennessey Dep. at 53: 13-24; 156:20-157:3.) | Disputed. The two step filtering process takes three minutes (Ex. 1 3/8/17 Hennessey Dep. 34:11-16.) The public records analysts receive no training from law enforcement, criminal attorneys or judges (Ex. 1 3/8/17 Hennesey Dep. 71:15-25). Public records analysts are not trained on different state criminal codes (Ex.1 3/8/17 Hennesey Dep. 85:13-15; 85:23-86:2). Court dockets are not reviewed, though Yardi has the ability to review them. (Ex.1 3/8/17 Hennesey Dep. 93:13-23). Yardi is unaware that Illinois offers deferred dispositions (Ex.1 3/8/17 Hennesey Dep. 100:2-6). Yardi's list of dispositions does not include any of the language contained on Plaintiff's Statement of Conviction/Disposition. (Ex.2 3/9/17 Hennesey Dep. 16:6-8). Yardi was on notice that BGC was not a reliable source of information. (Ex.1 3/8/17 Hennesey Dep. 156:4-12; Exhibit 28; 157:16-19; Ex. 2 3/9/17 Hennessey Dep. 48:11-13; Exhibit 11). |
| 10. In YRS's business there is nothing more important than ensuring the accuracy and integrity of the data they are selling. YRS ensures the accuracy and the completeness of its tenant screening reports through the automatic and manual filtering processes and procedures that it has in place. (Ex. 1, 3/8/2017 Hennessey Dep. at 206:19-207:9.) | Disputed. Yardi does not value accuracy above all else, it values speed, cost and accuracy equally. (Ex. 2 3/9/17 38:24-40:6) |
| 11. YRS keeps statistics on a month-to-month basis regarding its criminal history reports. (Ex. 1, Hennessey Dep. at 60:21-62:8; Ex. 26, Def. Resp. to Interrogs. Addendums A and B.) | Undisputed. |
| 12. In January of 2016- the month in which | Disputed as to the characterization of these |

| | |
|---|---|
| YRS prepared Plaintiff's criminal history report- YRS performed a total of 130,901 criminal screenings. These 130,901 criminal screenings resulted in 33,475 total screenings with criminal records. After applying its manual filtering process, YRS ultimately reported a criminal record on 10,137 reports. Consumer disputes were initiated on 235 of these 10,137 screenings. 201 of these disputes were successful. Thus only 201 of the 10,137- or 1.98%- of the reports containing criminal records resulted in a successful dispute. Overall, for January of 2016, 98.02% of the total criminal screenings with reported criminal records were accurately reported. (Ex. 26, Def. Resp. to Interrogs. Addenda A, B.) | statistics. Yardi does not know whether other disputes were initiated through BGC directly, or why consumers did not dispute records. The "accuracy rate" number doesn't reflect reports accurately reported, it is simply that no dispute was lodged. (Ex. 1, 3/8/17 Hennessey Dep. 70:8-13). |
| 13. The statistics from January of 2016 are consistent with data from March of 2015 through January of 2017. In the time frame, YRS's percentages of total criminal screenings with accurately reported criminal records ranged from 97.76% (in October 2015) through 99.54% (in January 2017). (Ex. 26. Def Resp. to Interrogs. Addendum B.) | Disputed as to the characterization of these statistics. Yardi does not know whether other disputes were initiated through BGC directly, or why consumers did not dispute records. The "accuracy rate" number doesn't reflect reports accurately reported, it is simply that no dispute was lodged. (Ex. 1, 3/8/17 Hennessey Dep. 70:8-13). |
| 14. The YRS tenant screening process begins when a rental property requests a report through the web portal, providing the applicant's name, social security number (if available), date of birth, and address. (Ex. 1, 3/8/2017 Hennessey Dep. at 41: 6-11.) | Undisputed. |
| 15. If the search is for criminal history only, a social security number is not necessary, as criminal records do not include social security numbers. (Ex. 6, YRS Criminal Screening Filtering Process at RG000063; Ex. 1, 3/8/2017 Hennessey Dep. at 80:10-81-13.) | Disputed. The vast majority of criminal records do not contain social security numbers, there are a handful that do. (Ex. 1 3/8/17 80:22-81:3.) |

| | |
|---|---|
| 16. YRS is a reseller of data it obtains from third-party data furnishers. (Ex. 2, 3/9/2017 Hennessey Dep. at 41:1-2.) It maintains no databases of background information. Instead, it requests information from other consumer reporting agencies that do maintain databases, and then provides reports to its clients through its integrated software and web portals, filtered through the clients' tenant criteria. (*See* Ex. 30, YRS Process Overview.) | Plaintiff disputes that YRS is a reseller.  YRS is a non-reseller CRA because it stores and maintains data in its database, and because it creates new information to place on a consumer report, information not obtained from any other source.  (Ex. 1 3/8/17 Hennessey Dep. 144:23-145:7; 32:24-33:8; 95:2-5; 96:19-97:2; 42:11-20; Ex. 1 Hennessey Dep. 3/9/17 7:21; 6:14-20; 7:2-12; Ex. 11). |
| 17. Specifically for criminal background searches, YRS applies a two-step filtering process on the records it receives from the data furnishers to ensure the maximum possible accuracy of its criminal history reports. (*See* Ex. 6, YRS Criminal Screening Filtering Process at RG00063-64.) | Plaintiff does not dispute that YRS applies a two-step filtering process.  Plaintiff disputes that this process ensures maximum possible accuracy.  The two step filtering process takes three minutes (Ex. 1 3/8/17 Hennessey Dep. 34:11-16.) The public records analysts receive no training from law enforcement, criminal attorneys or judges (Ex. 1 3/8/17 Hennessey Dep. 71:15-25). Public records analysts are not trained on different state criminal codes (Ex.1 3/8/17 Hennesey Dep. 85:13-15; 85:23-86:2). Court dockets are not reviewed, though Yardi has the ability to review them. (Ex.1 3/8/17 Hennesey Dep. 93:13-23). Yardi is unaware that Illinois offers deferred dispositions (Ex.1 3/8/17 Hennesey Dep. 100:2-6). Yardi's list of dispositions does not include any of the language contained on Plaintiff's Statement of Conviction/Disposition.  (Ex.2 3/9/17 Hennesey Dep. 16:6-8.)  Yardi was on notice that BGC was not a reliable source of information.  (Ex.1 3/8/17 Hennesey Dep. 156:4-12; Exhibit 28; 157:16-19; Ex. 2 3/9/17 Hennessey Dep. 48:11-13; Exhibit 11.) |
| 18. First, YRS filters the data received from the data furnisher with its proprietary | Disputed to the extent that Yardi can confirm the accuracy of data: It is not the regular |

| | |
|---|---|
| algorithms in order to eliminate false positives and confirm the accuracy of data. Then, a YRS team of public records analysts manually review each remaining record or "hit" in order to ensure the accuracy and timeliness of the records, and to apply the criteria set forth by each client. (Ex. 1, 3/8/2017 Hennessey Dep. at 54:9-16.) | practice of Yardi when it receives Cook County criminal records to send a vendor who has a runner to the courthouse to confirm the accuracy of the criminal records from the courthouse. (Ex. 2 3/9/17 Hennessey Dep. 50:5-12. Public records analysts do not review court dockets, they look at names and addresses (Ex.2 3/9/17 Hennessey Dep. 25:4-16). |
| 19. The first step, which is automatic, uses algorithms to exclude non-reportable information and any false positives from the data furnisher. Search results often include records that may be missing identifying information, such as date of birth information. Therefore, the initial search results often contain false positives- criminal records that are not a true match for the applicant. The initial search performed by third party criminal data furnishers may also include criminal records which are non-reportable under the Fair Credit Reporting Act. Examples of these non-reportable records are juvenile records, expunged records, charges with no conviction, and non-sex offender charges that are more than seven years old. (*See* Ex. 6, YRS Criminal Screening Filtering Process at RG000063; *see also* Ex. 1, 3/8/2017 Hennessey Dep. at 79:1-19.) | Undisputed. |
| 20. The first step of the YRS criminal screening filtering process automatically eliminates certain of these records, including records that are not properly matched up to a consumer, records of arrests that are older than seven years, and convictions that do not contain enough matching identifying information. (Ex. 1, 3/8/2017 Hennessey Dep. at 55:5-18.) | Disputed. The automatic filtering system does not automatically filter out deferred dispositions and some records that do not end in convictions. If it did, YRS public records analysts would not need to review the records and apply the disposition list to filter out what the automatic filter did not catch. (Ex. 34. See also SUF 21.) |

| | |
|---|---|
| 21. Because it is possible that non-reportable criminal records may make it through the automatic filtering system, YRS applies a second-level manual review by a public records analyst. (Ex. 6, YRS Criminal Screening Filtering Process at RG000064; Ex. 1, 3/8/2017 Hennessey Dep. at 82:17-21.) This public records analyst confirms that any remaining criminal record actually belongs to a consumer, based on the consumer information provided and that a record is not too old to be reportable. (Ex. 2, 3/9/2017 Hennessey Dep. at 21:10-19.) As part of the manual filtering step, public records analysts employ "charge exclusion rules" to determine whether a criminal charge is reportable under the Fair Credit Reporting Act. (*See* Ex. 8, Charge Exclusion Rules; Ex. 1,3/8/2017 Hennessey Dep. at 129:2-7.) A public records analyst has to look at multiple identifiers, including the applicant's name, date of birth, and address to determine whether or not there is a match between a criminal record and an applicant. (Ex. 1,3/8/2017 Hennessey Dep. at 81:19-82:5.) | Disputed as to whether the public records analysts actually review the records, given that the process to generate a report and make a decision only takes three minutes. (Ex. 1 3/8/17 Hennessey Dep. 34:11-16.) Disputed that the Charge Exclusion Rules instruct the public records analysts how to determine if the records are reportable under the Fair Credit Reporting Act. In fact, the Charge Exclusion Rules to not even reference the Fair Credit Reporting Act. (Ex. 8.) Undisputed that the public records analysts confirm the name, date of birth and address to determine if the criminal record is a match. |
| 22. YRS primarily relied on E-Backgroundchecks.com ("BGC") for criminal background searches in Illinois because in YRS's experience, BGC had the highest rate of reliability for the State of Illinois. (Ex. 1, 3/8/2017 Hennessey Dep. at 45:21-47:12.) YRS's agreement with BGC confirms that YRS is a "consumer reporting agency" as defined in the FCRA. Backgroundchecks.com is a d/b/a/ of e-backgroundchecks.com, Inc., which is a CRA that provides consumers' criminal background information to purchasers, including other CRAs such as | Disputed as to the accuracy of information that BGC provides because BGC notified YRS that its data may not be accurate and that the system and database were not designed to comply with the FCRA. (Ex. 1 3/8/17 Hennessey Dep 48:11-13; 156:4-12). |

| | |
|---|---|
| YRS. (Ex. 28, BGC Agreement at RG000080.) | |
| 23. At the time YRS obtained Plaintiff's criminal background information from BGC, BGC was subject to and by every indication in compliance with, a consent order issued by the Consumer Financial Protection Bureau ("CFPB") requiring it to use specified, robust procedures to ensure maximum possible accuracy with respect to its criminal background report. (See Ex. 22, Requests for Judicial Notice; Ex. 23, 10/29/ Consent Order filed in Admin. Case No. -CFOB-, available at http://files.consumerfinance.gov/f/201510 _cfpb_consent-order_general-information -service-inc.pdf; Ex. 24, 10/29/15 Stipulation and Consent to the Issuance of a Consent Order filed in Admin. Case No. 2015-CFPB-0028, available at http://files.consumerfinance/gov /f/201510_cfpb_stipulation_general- information-service-inc.pdf.) | Disputed. Plaintiff agrees that a Consent Order was entered but nothing in the record suggests that it was in compliance with the order. In fact, due to the erroneous information provided in this case, Plaintiff maintains that BGC was *not* in compliance with the Consent Order. (Ex. 3 Aldaco Deposition 285:22-24; Exhibit 19.) |
| 24. Cook County courts do not provide online criminal docket information. (Ex. 2, 3/9/2017 Hennessey Dep. at 44:4-8.) | Undisputed. |
| 25. With respect to criminal charges in the State of Illinois, it is YRS's policy to exclude criminal charges that did not result in a conviction. (Ex. 8, Charge Exclusion Rules at RG000136; Ex. 1, 3/8/2017 Hennessey Dep. at 136:3-9.) | Disputed. Yardi was not aware that Illinois had a deferred disposition statute. (Ex. 1 3/8/17 Hennesey Dep. 100:2-6). |

| | |
|---|---|
| 26. Plaintiff concedes that criminal convictions may be reported indefinitely under the FCRA. (Ex. 31, Compl. 35.) | Disputed as to the term conviction. *See* 730 ILCS 5/5-1-21; 730 ILCS 5/5-6-1. Plaintiff does not dispute that 15 U.S.C. § 1681(c)a(5) states that adverse information, other than records of convictions of crimes which antedate the report by more than seven years shall not be reported. |
| 27. YRS public records analysts are trained on how to do their job by the department managers and by senior members of the public records team. The training typically takes several months. Before an employee can start working as a public records analyst, the employee has to go through a certain number of training sessions and pass several tests. (Ex. 1, 3/8/2017 Hennessey Dep. at 75:14-76:12; Ex. 33, FCRA Compliance Training Module.) YRS employees in the screening business also are required to attend training with respect to the Fair Credit Reporting Act at least once annually. (Ex. 1, 3/8/2017 Hennessey Dep. at 17:20-18:1.) | Disputed. The people responsible for the reinvestigations and for reviewing the records YRS received from BGC, are neither trained by law enforcement, criminal attorneys or judges (Ex. 1 Hennessey Dep. 71:15-25). YRS knows that criminal laws vary from state to state, but it does not train the analysts on the criminal codes of different states. (Ex. 1, Hennessey Dep 85:13-15; 85:23-86:2). Mr. Hennesey could not even confirm that the individuals who are responsible for manually filtering criminal records to "assure maximum possible accuracy" are trained on how to detect deferred dispositions. (Ex. 1, Hennesey Dep. 98:4-7.) Nor could he confirm if YRS's public records analysts were made aware that Illinois had a deferred disposition statute. (Ex. 1 Hennessey Dep. 100:2-6.) |
| 28. YRS also maintains a "Public Records Analyst Training Guide," which is a step-by-step procedure book that discusses policies with respect to what is reportable and not reportable under the Fair Credit Reporting Act. Every public records analyst has the guide available to them, and must review the guide before starting their position as a public records analyst. (Ex. 1, 3/8/2017 Hennessey Dep. at 110:15-111:12; Ex. 27, Public Records Analyst Training Guide.) | Disputed as to deferred disposition: the disposition list is the only document which is consulted on how to report a deferred disposition (Ex. 2, Hennessey Dep. 20:4-7). |
| 29. All of the YRS policies and procedures | Undisputed. |

| | |
|---|---|
| are sources of information that are available to YRS personnel in the tenant screening business. (Ex. 1, 3/9/2017 Hennessey Dep. at 48:2-7.) | |
| 30. The YRS public records analysts are trained to spot dispositions that are convictions, and dispositions that are not convictions. This training occurs through a "disposition list," which is a list of terms that can appear in the disposition field of a criminal records report. The dispositions are identified as either being equivalent to being convicted or equivalent to being acquitted. (Ex. 34, Disposition List; Ex. 1, 3/8/2017 Hennessey Dep. at 119:9-120:5.) | Disputed. The people responsible for the reinvestigations and for reviewing the records YRS received from BGC, are neither trained by law enforcement, criminal attorneys or judges (Ex. 1 Hennessey Dep. 71:15-25). YRS knows that criminal laws vary from state to state, but it does not train the analysts on the criminal codes of different states. (Ex. 1, Hennessey Dep 85:13-15; 85:23-86:2). Mr. Hennesey could not even confirm that the individuals who are responsible for manually filtering criminal records to "assure maximum possible accuracy" are trained on how to detect deferred dispositions. (Ex. 1, Hennesey Dep. 98:4-7). Nor could he confirm if YRS's public records analysts were made aware that Illinois had a deferred disposition statute. (Ex. 1 Hennessey Dep. 100:2-6.) Disputed as to deferred disposition: the disposition list is the only document which is consulted on how to report a deferred disposition (Ex. 2, Hennessey Dep. 20:4-7). |
| 31. There are hundreds of synonyms used by courts throughout the United States to describe case dispositions. YRS keeps track of the multiplicity of different disposition descriptions by documenting all of the descriptions they have encountered. When it encounters new dispositions descriptions, YRS looks them up and documents them. (Ex. 34, Disposition List; Ex. 1,3/8/017 Hennessey Dep. at 91:1-16.) | Disputed. No reference is made to supervision (Ex. 2 Hennessey Dep. 15:16-20), it contains no reference to Supervision Terminated (See Exhibit 34), And it contains no reference to "discharged" (Ex. 2 Hennessey Dep. 16:6-8). |
| 32. YRS's public records team uses the | Undisputed. |

| | |
|---|---|
| disposition list when they come across a word, term, or statement in the disposition field of criminal conviction charge that they are not familiar with. The public reference team would reference the disposition list to identify what the disposition is, and what action should be taken. (Ex. 2, 3/9/2017 Hennessey Dep. at 11:10-17.) | |
| 33. In preparing Plaintiff's tenant screening report, YRS followed its procedures to ensure maximum possible accuracy. YRS did not deviate from those procedures in preparing Plaintiff's report. (Ex. 2, 3/9/2017 Hennessey Dep. at 9:23-10:11.) Plaintiff's criminal history was obtained from BGC. (Ex. 1,3/8/2017 Hennessey Dep. at 47:5-8; Ex. 11, BGC Report.) It was then run through the automatic filtering process, and manually reviewed by a YRS public records analyst. (Ex. 1, 3/8/2017 Hennessey Dep. at 157:20-159:3; Ex. 35, Screenshot of Add Serve System.) | Disputed. The disposition list does not contain the terms supervision or supervision terminated, and so the public records analysts could not have followed procedure and consulted it. No reference is made to supervision (Ex. 2 Hennessey Dep. 15:16-20), it contains no reference to Supervision Terminated (See Exhibit 34), And it contains no reference to "discharged" (Ex. 2 Hennessey Dep. 16:6-8).Had they consulted this list, the terms would have appeared in an update.<br><br>Plaintiff does not dispute that the data pertaining to her criminal record was received from BGC and that Yardi believes it ran through the automatic and manual filtering process. |
| **IV. Plaintiff's Criminal History Report** | |
| 34. Plaintiff Rafaela Aldaco applied with a private, faith-based organization called Fellowship Housing Corporation ("FHC") to obtain subsidized housing through a two-year program for single mothers at risk of homelessness. (Ex. 7, FHC Application; Ex. 31, Compl. 12.) | Undisputed. |
| 35. FHC maintains a number of potential housing options, including apartments at The Reserve of Hoffman Estates ("The Reserve"). (Ex. 4, H. Corins Dep. at 45:5-18.) The | Undisputed. |

| | |
|---|---|
| Reserve is located at 875 Pacific Ave., Hoffman Estates, IL 60169. (Ex. 32, Pltf. Resp. to Interrogs. 4.) The Reserve is also known as IVC Hoff Real Estate Ventures, LLC and is owned and operated by BH Management Services LLC, a YRS client. (Ex. 29, BH Management Services Agreement.) | |
| 36. Plaintiff was approved through the FHC process and then visited The Reserve at Hoffman Estates with a FHC representative on January 12, 2016 in order to complete The Reserve's application process. (Ex. 31, Compl. 15-16.) | Disputed as to the purpose of the January 12, 2016 visit. Plaintiff came to The Reserve to pick up her keys and move in and was told, at the last minute, that a new background check had to be completed. (Ex. 3 Aldaco Dep 152:3-14). |
| 37. The Reserve's Resident Screening Criteria dictates that they do not accept tenant who have been convicted at any time of battery or assault. (Ex. 17, BH Management Resident Screening Criteria at RG00239.) | Plaintiff disputed that the document suggests the Reserve would not accept a tenant who had been convicted at any time of battery or assault, Ex. 17 only shows that this is information requested. |
| 38. At the time of Plaintiff's visit, The Reserve requested a criminal-only background check on Plaintiff through the YRS portal. (Ex. 1, 3/8/17 Hennessey Dep. at 124:14-20; Ex. 5, Tenant Screening Report.) That background check, from BGC, resulted in a report that Plaintiff did not meet The Reserve's tenant requirements, so Plaintiff's application with The Reserve was not accepted. (Ex. 5, Tenant Screening Report.) Plaintiff then left and did not further contact The Reserve. (Ex. 3, Aldaco Dep. at 151:18-156:2.) | Disputed. YRS prepared an OFAC report and evaluated and compiled the data to determine if Plaintiff met the property's requirements. EXHIBIT 36 attached hereto. Plaintiff also disputes that the background check came from BGC. The background check was a tenant screening report prepared and published by YRS. (Ex. 36.) |
| 39. Pursuant to the requirements of the FCRA, Plaintiff was given information so that she could contact YRS to find out why she did not qualify for The Reserve. (Ex. 14, | Disputed. Plaintiff contacted YRS to determine what appeared on her background check and received a copy of her tenant screening report. (Ex. 36.) Plaintiff also |

| | |
|---|---|
| 1/12/16J. Yellin E-mail and Attachments at RG 000049-62.) That same day, January 12, 2016, YRS provided her a copy of the criminal report based on information it received from E-Backgroundchecks.com (*Id.* at RG000050-54.) That report revealed a 1996 conviction for battery in Cook County, to which Plaintiff was sentenced to court supervision and community service. (*Id.* at RG000055-57.) YRS reported the record exactly at YRS received it from E-Backgroundchecks.com, the date furnisher. (*Compare id.* at RG000055-57 *with* Ex. 11, BGC Report at RG000009-13.) | disputes that he was convicted of battery, but does not dispute that the TSR shows a battery charge. (Ex. 36. Ex. 3 Aldaco Dep. 285:22-24.) Plaintiff received an order of court supervision and community service, both deferred dispositions. (Ex. 19.) After completion of her court supervision, the charges against her were discharged. (Ex. 19). |
| 40. YRS also sent to Plaintiff, that same day, instructions and the dispute form should Plaintiff want to dispute the record. (Ex. 14, J. Yellin E-mail and Attachment at RG000049-62.) That dispute form requested multiple types of information and specifically requested that Plaintiff provide any supporting documentation to her dispute. (*Id.* at RG000058.) | Plaintiff does not dispute that she received information from YRS regarding disputing the criminal record. Plaintiff disputes that the form requested supporting documentation: It notes that if the disputing consumer has any additional information it may be provided. Ex. 14. However, at this time, Ms. Aldaco did not recognize the conviction, as she was not convicted of a crime. (Ex. 3 Aldaco Dep. 178:3-12; 285:22-25' Ex. 19.) |
| 41. Plaintiff indeed submitted the dispute form that day, which disputed only that the record at issue did not belong to her, but instead to a former boyfriend. (Ex. 18, R. Aldaco Dispute Form; Ex. 3, Aldaco Dep. at 163:8-164:14.) Plaintiff provided no other information indicating any other purported inaccuracy nor any supporting documentation. (Ex. 18, R. Aldaco Dispute Form; Ex. 9, 1/12/16 R. Aldaco E-mail and Attachments; Ex. 3, Aldaco Dep. at 172:12-174:18.) Importantly, at no point did Plaintiff state that the record was incomplete or inaccurate because she has completed her sentence of | Disputed. Plaintiff did not recall being convicted of battery, only that she had taken out an order of protection against Felipe Ruacho, and believed that this record reflected that situation. (Ex. 3 Aldaco Dep. 163: 12- 164:14.) She did inform YRS that the record was inaccurate by informing YRS that she was not convicted of anything. (*Id.*) |

| | |
|---|---|
| community service and court supervision and/or that the conviction was dismissed. (*Id.*) Instead, Plaintiff still maintains that the record does not belong to her-which is belied by the Certified State of Conviction/Disposition. (Ex. 3, Aldaco Dep. at 186:8; Ex. 19, Court Disposition.) | |
| 42. YRS forwarded the dispute request to E-backgroundchecks.com, the data furnisher, for investigation pursuant to the FCRA procedure. (Ex. 12,1/13/16 Email at RG000039-41.) | Plaintiff does not dispute that YRS forwarded her dispute to BGC, but disputes that YRS was under no obligation to investigate the dispute. 15 U.S.C. § 1681i. YRS is a non-reseller CRA. It stores and maintains data in its database, and because it creates new information to place on a consumer report, information not obtained from any other source. (Ex. 1 3/8/17 Hennessey Dep. 144:23-145:7; 32:24-33:8; 95:2-5; 96:19-97:2; 42:11-20; Ex. 1 Hennessey Dep. 3/9/17 7:21; 6:14-20; 7:2-12; Ex. 11). Plaintiff does not dispute that YRS has been in business since 1989. |
| 43. YRS also undertook its own investigatory steps as a courtesy. (Ex. 1, 3/8/2017 Hennessey Dep. at 169:21-170:4.) A YRS team member contacted the Cook County Clerk's office to confirm the identity of the record, but the team member received no response. (Ex. 15, Dispute Investigation Note: Ex. 1, 3/8/2017 Hennessey Dep. at 162:22-163:2.) | Plaintiff disputes that YRS performed an investigation. YRS's "investigation" consisted of making two un-answered phone calls to the Cook County Clerk's office, as memorialized in Exhibit 15. (SUF Exhibit 15, Deposition of RH, Vol. 1 215:10-23.) Exhibit 15 is a screenshot of the CRM system which logs activities pertaining to the investigation of Plaintiff's dispute and is the only document pertaining to YRS's investigation. (Ex. 1 Hennessey Dep. 210:17-21). |
| 44. A few days later, YRS received notice from E-backgroundchecks.com that based on its investigation, the record at issue did belong to Plaintiff and therefore, that no change to the record was warranted. (Ex. 10, | Disputed. BGC notified YRS that the information contained in the report was accurate and warrants no change. (Ex. 10). Plaintiff does not dispute that YRS reported the result to Plaintiff and the Reserve. |

| | |
|---|---|
| 1/15/16 Email at RG000008.) YRS reported that result to both Plaintiff and to its customer, The Reserve. (Ex. 13, 1/18/16 Email from J. Yelling to R. Aldaco at RG000042-47; Ex. 16,1/18/16 Email from J. Yellin to BH Management at RG000048.) | |
| 45. YRS also informed Plaintiff at that time that she could contact either E-Backgroundchecks.com, the consumer reporting agency that provided YRS with the disputed information, or she could re-contact YRS. (Ex. 13, 1/18/16 Email from J. Yellin to R. Aldaco at RG 42.) | Disputed. Plaintiff received this email after her dispute on January 13, 2017. Her dispute was made to YRS, the company that prepared a background check. The email does not inform Ms. Aldaco to contact E-Backgroundcheck.com. (Ex. 13.) Interestingly, it does instruct Ms. Aldaco to review the *original information in the public record*. (*Id.*)-an act they refused to carry out themselves to confirm that the record was accurate. (Ex. 1 Hennessey Dep. 175:1-13; 175:22-176:1.) |
| 46. During this timeframe, Plaintiff consulted with FHC and an attorney, and then Plaintiff herself went to the Cook County Clerk's office and obtained a paper record Certified Statement of Conviction/Disposition of her 1996 battery conviction, Case No. 96401466301, on or about January 21, 2016. (Ex. 19, Court Disposition; Ex. 3, Aldaco Dep. at 166:12-172:6.) The record indicated that Plaintiff was found guilty of battery and was sentenced to community service and court supervision. (Ex. 19, Court Disposition.) | Plaintiff disputes this statement as to "during this timeframe" is ambiguous and vague. Plaintiff disputed the timeframe during which she consulted with an attorney. (See Declaration of Roger Zamparo Ex. 39.) She does not dispute that she obtained records from the Cook County Clerk's office. Plaintiff further disputes the interpretation of the Certified Statement of Conviction/Disposition in that she was not "sentenced". (Ex.19). |
| 47. That paper record contains identical information as that reported by E-Backgroundchecks.com to YRS (and later relied upon by YRS in completing Plaintiff's background check), except that the paper record also includes a date of June 17, 1997 | Disputed. The Certified Record of Conviction/Disposition in vastly different from the information reported by both BGC and YRS. The Certified Record evidences that the charge were dismissed. The Certified Record evidences that Aldaco was not |

| | |
|---|---|
| as discharge of the supervision term. (*Compare* Ex. 11, BGC Report at RG000009-13 *with* Ex. 19, Court Disposition.) | convicted of a crime. The Certified Record also shows she was only ordered to 6 months of community service, *not* 60 months, as reported by both BGC and YRS. (Ex. 19). |
| 48. Neither Plaintiff nor her attorney provided the paper record to YRS or E-Backgroundchecks.com, nor did Plaintiff (or her attorney) contact either YRS or E-Backgroundchecks.com with any further information. (Ex. 3, Aldaco Dep. at 172:7-174:18.) | Disputed. Plaintiff's attorney provided YRS with the certified statement of disposition. (See Ex. 40.) Nevertheless, this document, and the information contained therein, was available at the Cook County clerk's office, which YRS could have asked someone to obtain. (Ex. 1 Hennesey Dep. 175:1-8.) |
| 49. Instead, Plaintiff's attorney, through FHC, advised Plaintiff to "keep a log of expenses," and Plaintiff worked with her attorney to have the 1996 battery conviction expunged, which was completed on May 1, 2016. (Ex. 21,1/22/16 H. Corins Email at FHC000105; Ex. 20, Expungement Order.) Plaintiff also discontinued her application for participation in the FHC program during this time. (Ex. 3, Aldaco Dep. at 184:16-186:9.) | Disputed. Plaintiff did not retain Zamparo Law Group until March 14, 2016. (See Declaration of Roger Zamparo Exhibit 39). Zamparo Law Group's first contact with Plaintiff was to schedule a February 17, 2016 meeting. (*Id.*) Zamparo Law Group provided no legal advice in the email to Ms. Corins. (Ex. 21.) Her ineligibility for the apartment precluded her from the FHC program. (Ex. 3 Aldaco Dep. 185:13-18.) She was not eligible until another apartment opened up but she would need to reapply to the program. (Ex. 3 Aldaco Dep 186:2-9). Plaintiff also objects to the gratuitous disparagement of Plaintiff's counsel contained in Defendant SUF 49. The statement, not cited to at all in Defendant's Motion, must be stricken. |

## PLAINTIFF'S SEPARATE STATEMENT OF ADDITIONAL FACTS

50.     YRS stores raw data it receives in its database, and YRS creates information contained on the tenant screening reports. (SUF Ex. 1 Hennessey Dep. 34:11-16.) The criminal record information YRS requests from BGC is raw data, not a compiled report. *Id.* at 144:23-145:7 (referring to SUF Exhibit 11, showing a printed version of the raw data received from BGC). YRS does not forward the raw criminal data it receives from BGC to the management company. (*Id.* at 32:24-33:8.)

51.   YRS has to analyze the data, and exclude information that was not requested or not appropriate to include in a report (i.e. information that belongs to another consumer, was not reportable for some other reason.) (Ex. 1 Hennesey Dep 95:2-5; 96:19-97:2.)  The collected data is stored for seven years in YRS's Customer Relationship Management ("CRM") system. (Ex. 2 Hennesey Dep. 7:18-21.)

52.   In the instant matter, Plaintiff's TSR states: "Individual Result: Does Not Meet Requirements." SUF Exhibit 5. YRS testified that statement is YRS's assessment that the applicant does not meet the requirements of the management company. (Ex. 1 Hennessey Dep. 42:11-20.)

53. When Plaintiff asked to received her consumer report after her denial, YRS did not have to re-request any information from its criminal background check vendor, because the information that was contained in her consumer report was stored in YRS's database. (Ex. 2 Hennessey Dep. 6:14-20.  Exhibit 36)  The following day, on January 13, 2016 at 3:52 p.m. a new report was generated and it consisted of the data previously obtained from BGC and a new OFAC Name Search. (Ex. 2 Hennessey Dep. 6:14-20, 7:2-12.) Finally, YRS generated a third report on

Plaintiff, on June 3, 2016. (Ex.5). When it generated this report it did not re-request any information from BGC, because by June 3, 2016, Plaintiff's criminal record had been expunged and would not have appeared if a new search had run through BGC. (Ex. 20.  Ex. 1 Hennessey Dep. 9-20.)

54. The data it keeps is not only the data that it placed on Plaintiff's report, it is also the data it excluded from her report. SUF Exhibit 35 shows data stored in YRS's database that is received from BGC. (Ex. 1 Hennessey Dep. 156:1-3.)

55. Plaintiff had no recollection of the events leading up to the charge that appeared on her background check and therefore disputed it as not being hers. (Ex. 3 Aldaco Dep. 178:3-12. 187:2-4.) Moreover, she was never convicted of a crime, and so did not remember a conviction. (Ex. 3 Aldaco Dep. 187: 18; 188:2-3; 285:22-24; Ex. 19.)

56. YRS's policy and procedure with respect to conducting an investigation upon receiving a dispute consists of forwarding the dispute to a senior analyst who would check the courthouse website for available information, and to make attempts to call the courts. (Ex. 1 Hennessey Dep. 172:22-25.) This is the only action YRS takes to investigate the dispute. (*Id.* at 174:21-25.)

57. After receiving Plaintiff's dispute, YRS's investigation consisted of making two un-answered phone calls to the Cook County Clerk's office, as memorialized in Exhibit 15. (Ex. 15, Ex. 1 Hennessey Dep. 215:10-23.) Exhibit 15 is a screenshot of the CRM system which logs activities pertaining to the investigation of Plaintiff's dispute and is the only document pertaining

to YRS's investigation. (*Id.* at 210:17-21.) The investigation started and ended on January 14, 2016. (Ex. 15.)

58. YRS has sent individuals to a courthouse to review court dockets, but does not do this as a matter of practice. (Ex. 1 Hennessey Dep. 175:1-8.) In fact, only if there is already a person at the courthouse, would this practice of asking a live person to review the court records take place. (*Id.* at 175:9-13.) YRS does not know if the dispute investigator are able to tell if a live person is already at the courthouse, such that the dispute investigators could ask for assistance in reviewing the actual court file. (*Id.* at 175:22-176:1.)

59. It is not common practice for the dispute investigators to make any other phone calls to investigate the dispute. (Ex. 1 Hennessey Dep. 176:2-8.) Other than these two steps, YRS awaits the result of their vendors' investigation, though YRS does not know how their vendors, specifically BGC, conducts their investigation. (*Id.* at 180:24-181:6.)

60. YRS's two step filtering process to assure maximum possible accuracy employs an automatic filtering process and a manual filtering process. Step two employs the use of a live person (public records analyst) to review the criminal records to ensure the records are accurate and up- to date, and to evaluate the records to determine if a prospective tenant meets the properties requirements. (Ex. 1 Hennessey Dep 34:11-16.) This two-step filtering process takes merely three minutes. (*Id.* at 33:24- 34:2.)

61. The people responsible for the reinvestigations and for reviewing the records YRS received

from BGC, are neither trained by law enforcement, criminal attorneys or judges. (Ex. 1 Hennessey Dep. 71:15-25.)

62. YRS knows that criminal laws vary from state to state, but it does not train the analysts on the criminal codes of different states. (Ex. 1 Hennessey Dep 85:13-15; 85:23-86:2.)

63. Though it is possible for public records analysts to actually review the court dockets, the only time that happens is when the management company requests a copy of the court docket, even in the State of Illinois.( Ex. 1 Hennessey Dep Vol.1 93:13-23.)

64. YRS has been familiar with deferred disposition for at least ten years. (Ex. 1 Hennessey Dep 141:8-18.) YRS is also aware that there are several different types of dispositions which vary from state to state and even county by county. (Ex. 1 Hennessey Dep 91:1-11.) YRS keeps a list of dispositions for its public records analysts to refer to when they are unsure of a term used in a criminal record. (Ex. 1 Hennessey Dep 91:1-16. Ex. 2 Hennessey Dep 10:19-11:7; 11:10-17, 19:21-20:3.) No other sources of information used at YRS contain any other information on how to report a particular disposition. (Ex. 2 Hennessey Dep. 20:4-7.)  To that end, Mr. Hennesey testified that YRS "We document all of the ones that we have encountered and confirm what they are and if there are new ones that are encountered, they are looked up, and documented for what they are." (*Id.*) YRS knows deferred dispositions exist, but does not know which states offer deferred disposition. (Ex. 1 Hennessey Dep. 98:15-99:3). Mr. Hennesey could not even confirm that the individuals who are responsible for manually filtering criminal records to "assure maximum possible accuracy" are trained on how to detect deferred dispositions. (*Id.* at 98:4-7.)

65. Mr. Hennessey also testified that YRS was not aware that Illinois had a deferred disposition statute. (Ex. 1 Hennessey Dep. 99:15-17.) Nor could he confirm if YRS's public records analysts were made aware that Illinois had a deferred disposition statute. (*Id.* at 100:2-6.)

66. And when asked about whether deferred depositions are considered convictions at YRS, YRS responded that it would depend on what the criminal record showed. (Ex. 1 Hennessey Dep 106:18-23.) When looking at Plaintiff's criminal record, YRS was not aware that the final disposition of her criminal case showed the supervision was terminated and the charges discharged. (*Id.* at 107:14-20.) And most tellingly, Mr. Hennessey, the corporate representative testifying for YRS could not state what the company's position was in a situation, as here, where the final disposition was that the charges were discharged. (*Id.* at 107:25-108:6.)

67. The exhaustive disposition list used at Yardi contains no reference to sentenced to community service (Ex. 2 Hennessey Dep. 15:10-15), it contains no reference to supervision (*Id.* at 15:16-20), it contains no reference to Supervision Terminated (See Ex. 34), and it contains no reference to "discharged" (*Id.* at 16:6-8).

68. The contract between BGC and YRS, entered into on October 23, 2006, specifically states that the BGC "system database and website *have not been designed or developed to meet FCRA requirements." (*Ex. 1 Hennessey Dep 156:4-12, see also Ex. 28.) BGC even disclaims any warranties of fitness of its database for FCRA purposes. (Ex. 1 Hennessey Dep 157:16-19, Ex. 28.) In Article 4 of the Contract, in bold, capital letters BGC disclaims the accuracy of its data.

Since 2006, nearly ten years before Plaintiff's criminal records were inaccurately reported on her background check, YRS was on notice that "**BGC DOES NOT WARRANT THE ACCURACY OR THE CORRECTNESS OF THE DATABASE OR THE INFORMATION CONTAINED THEREIN**" (Ex 28, Ex. 2 Hennessey Dep 48:11-13.) Even the report YRS received from BGC states "This report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation…" (Ex. 11.)

69. Most importantly, the Cook County court system demands a disclaimer be placed on the BGC report: "The Court does not warranty the accuracy, completeness, or currency of this data. This data is not and may not be represented as an official record of the Court or of the Clerk. The official court record may be found in the hard copy files held and maintained by the Clerk. The Clerk provides no warranties, express or implied, that the information or data is accurate, complete or correct." (Ex. 11, Ex. 2 Hennessey Dep 42:9-19.)

70. In January 2016, YRS performed 130,901 criminal screenings for background checks. (Ex. 26). After the automatic filtering process suppresses certain criminal records, 10,137 criminal screenings showed some kind of criminal record. *Id.* 235 disputes were initiated with YRS based on the results of the background check, and 201 of those disputes were successful, resulting in a modification of the criminal record. *Id.* That is an error rate of 85.53% of applicants who initiated a dispute. In 175 of those instances, the property changed its decision. There is no record or information on why there were no disputes on the other criminal records. (Ex. 1 Hennessey Dep 70:5-7. ) And though YRS claims an accuracy rate of 98.02%, in deposition, YRS testified that that number does not reflect reports accurately reported, it is simply that no dispute was lodged.

(Ex. 1 Hennessey Dep 70:8-13.)

71.     The TSR was the very last step in moving in to her new apartment. In fact, January 12, 2016 was her move-in date and she went to the management office to pick up the keys to move her personal belongings in. (Ex. 3 Aldaco Dep. 150:24-151:3; 154:6-11.) The Reserve then requested a second background check and she was told that she would not be able to move into the property. (*Id.* at 153:22-24.) Plaintiff was told at that time that due to something on her background check she was not able to move in. (*Id.* at 154:17-22.) When pressed on what appeared on her report, the management personnel provided Plaintiff with the phone number to YRS so that she could speak with them directly. (*Id.* at 155:10-15.) Even Heather Corins, director of Fellowship Housing, contacted The Reserve to attempt to get her into the apartment after she was denied, and was told by the Reserve that there was nothing they could do and that "they wouldn't make an exception based on that report that was provided." (Ex. 4 Corins Dep. 51:8-19.) With that notation on her background check, she would not be able to move into the apartment complex. (*Id.*  54:7-13.)

72. Plaintiff suffered economic damages for her loss of Fellowship Housing opportunities in the amount of $43,350.45 as follows: Renal Support $13,200, Utility Subsidies of $2,400, Debt Payment Matching of $3,600, Tax Refund Matching $1,600, Counseling Services and tutoring for her children $7,600 and various other incentives in an about of $1,000. (Ex. 38: Plaintiff's Responses to Interrogatories No. 12.) She also claimed other economic damages in the amount of $13,950.45.(*Id.)*

73. Plaintiff suffered from emotional distress: she was considered homeless, which damaged her reputation (Ex. 3 Aldaco Dep. 269:16-17); causing her so much stress that she suffered from headaches and constant vomiting episodes (*Id.* at 276:21-277:25); she was short-tempered and angry (*Id.* at 278:21-23); she gained significant amount of weight (*Id.* at 278:24-279:3); she was also bedridden for days after the incident. (*Id.* at 279:4-11). Plaintiff's self-esteem suffered because she was branded a criminal *Id.* at 279:25-280:7. Plaintiff was also ashamed. *Id.* at 280:11-23.

74. This testimony was corroborated over and over again by the numerous witnesses YRS called to deposition: Clementine Frazier testified that Plaintiff changed after she could not move into the Fellowship Housing unit: she was disappointed, frustrated, angry and helpless (Ex. 41 Frazier Dep. 58:1-6), she would cry and was depressed (*Id.* at 58:14-24); she couldn't sleep and was not her normal self and suffered from headaches. (*Id.* at 59:23-60:7.)

75. Wilhemina Maldonado also corroborated her emotional distress: she suffered from migraines after her denial (Ex. 42 Maldonado Dep. 60:6-10); she broke down (*Id.* at 19:2-12); she was very emotional about the denial and was depressed and crying (*Id.* at 35:2-3), anxious and worrying (*Id.* at 36:16-20).

76. Notably, the background check prepared through RealPage for Fellowship Housing on December 14, 2015 did not include this criminal record. (Ex. 37.) There can be no better evidence of YRS's failure to block obsolete information, then another background check company refusing to place the same information on Plaintiff's report.  (See Ex. 37.)

DATED: June 22, 2017            **ZAMPARO LAW GROUP, P.C.**

By:     */s/ Stephanie R. Tatar*
        Stephanie R (Gast) Tatar, Esq.
        Roger Zamparo, Jr.
        Steven J. Ulrich
        2300 Barrington Road, Suite 140
        Hoffman Estates, IL 60169
        (224) 875-3202 (t)
        (312) 276-4950 (f)
        stephanie@zamparolaw.com
        roger@zamparolaw.com
        steven@zamparolaw.com